[Crim. No. 2412.   Second Appellate District, Division Two.—September 28, 1933.]

THE PEOPLE, Respondent, v. JOHN BARR et al., Defendants; VINCENT MARSIGLIA et al., Appellants.

William P. Redmond, Samuel A. Rosenthal, Max M. Gilford, Ben Van Tress, S. S. Hahn, W. O. Graf and Phi O. Clough for Appellants.

U. S. Webb, Attorney-General, and John D. Richer, Deputy Attorney-General, for Respondent.

ARCHBALD, J., *pro tem.*—Appellants Eckelberry and Marsiglia, together with defendants Barr, Griffith, Woodington and Lewis, were jointly charged in an information filed by the district attorney with conspiracy to commit a felony, in count I, burglary, in count II, robbery, in count III, and grand theft, in counts IV and V. On the same day another information was filed charging appellants Lawler and Denniston and defendant Laughlin with the same crimes, and in count VI of said second information with receiving stolen property. The first information also charged a prior conviction of felony as against Marsiglia, and the second a prior conviction against Lawler, which prior convictions were admitted. The charges under the two informations were consolidated for trial. Marsiglia, Eckelberry and Lawler pleaded not guilty, waived jury and were found guilty by the court on counts I and III of the first information mentioned, and defendant Lawler on counts I and III of the second, the other counts being dismissed. They have filed separate appeals from the judgments of conviction and from the orders denying their motions for a new trial.

Appellant Denniston withdrew his plea of not guilty and pleaded guilty as to count VI. He then applied for probation, which was denied, whereupon judgment was pronounced, the other counts being dismissed. He has appealed from such judgment of conviction and from the order denying his application for probation.

The warehouse of Smart & Final, Ltd., in Pasadena, was entered on the night of January 29, 1933, and a large quantity of cigars and cigarettes was loaded on a truck belonging to that firm and hauled away. The watchman, William A. Pinkley, was held up inside the warehouse, by two men, one having a gun, and was hit over the head, blindfolded and his hands tied behind him with a wire. He was then taken to the cellar, where his feet were tied, and

was left there while the truck was being loaded and driven away. When he finally worked loose he found the front door unlocked, although it had been locked by him after entering that evening. It was shown that approximately 120 cases of cigarettes and six or seven cases of cigars were stolen, all of the boxes having the name of the firm stenciled on the outside. The truck was found by the Los Angeles police at Eighty-seventh and Vermont Streets, Los Angeles, and returned the next day. Frank McDannald, a warehouseman employed by Smart and Final, saw a number of cases of Smart and Final cigars and cigarettes in a candy and tobacco store at No. 1010 West Eighty-fifth Street, Los Angeles, on the day after the burglary in question, where he also saw appellant Denniston, and while standing in front of the store, according to his testimony, a man drove up and left six cases of cigarettes. The witness then went back into the store and observed that the stencil-mark had been removed from such cases. He identified them in court as having come from Smart and Final's warehouse, by a cross-mark he had put on them in the warehouse.

Defendant Barr pleaded guilty and testified for the prosecution, connecting Laughlin, Lawler, Eckelberry, Woodington, Lewis and a party known to him as "Dago" with the conspiracy, and Woodington, Griffith and the "Dago" as having entered the warehouse with him, while it was agreed that Laughlin and Eckelberry would meet the truck somewhere down the street. Pinkley, the watchman, identified defendant Woodington as the man who held the gun on him. Other witnesses, not accomplices, testified to seeing the men together just shortly before the warehouse was entered, and to seeing some of them together thereafter. One of such witnesses identified appellant Marsiglia as one of the group and testified that he was introduced to him as "Dago".

A police officer testified to seeing Lawler and Denniston at No. 1010 West Eighty-fifth Street on January 30th, and to having observed a number of cigarette cases with something torn away from them. Another officer testified that on January 30th he went to the premises at No. 2058 West Eighty-fifth Street and that defendant Denniston gave him the key to his garage, in which he found a large quantity of cases of cigarettes and cigars; that he then went into Denniston's house and found in the bedroom six or eight

cases of cigars covered with a blanket, and more cases in a clothes closet. With regard to the condition of the cases, he testified that something had been removed as if partly cut with a knife and then torn the rest of the way.

Appellant Marsiglia contends (1) that the evidence was insufficient to sustain the judgment against him on either count, and (2) that the court erred in admitting evidence against him.

■ (1) A witness named Baggett testified that he knew Marsiglia, who was introduced to him as "Dago", and that he saw Eckelberry and Barr with Marsiglia in the afternoon of the 29th of January at his home, and that the three left together, Barr returning later in the evening. A witness named Ream testified that he knew Marsiglia and that he saw him with Woodington, Griffith, Laughlin and Lewis at Barr's home on the evening of the 29th; that they were there when he left, at about 7:30 P. M.; that near midnight he saw Barr and Marsiglia at Baggett's home and went with them to Los Angeles; that on the way he overheard Marsiglia tell Barr that it was a good thing Smart and Final's name on the truck had been covered up, and heard him ask Barr how many cigars they got. Police officer Decker testified that he asked Marsiglia why he ever went in on such a proposition, to which the latter replied, "Well, I was up against it. I wanted to help my sister out," and other language which could only be taken as an admission. All of which was ample evidence to support the implied finding that Marsiglia was not only in the conspiracy but was actually the "Dago" who took part in the burglary. It is not necessary that the evidence corroborating that of an accomplice should of itself establish the fact that the defendant committed the offense charged; and even though slight it is sufficient if it tends to connect the defendant therewith. This defendant's own admissions afforded corroborative proof sufficient to sustain the verdict against him. (*People* v. *Negra,* 208 Cal. 64 [280 Pac. 354].)

■ (2) Many objections were made by counsel for Marsiglia to the relation of conversations involving the "Dago", on the ground of "no foundation laid". We know of no such objection, although it seems to be made by many lawyers. Only where the subject matter of the conversation is used for the purpose of impeachment is it neces-

sary to lay a foundation of time, place and persons present (sec. 2052, Code Civ. Proc.). Here no impeachment was attempted. The testimony consisted simply of a relation of conversations connecting the man called "Dago", who was not identified by the witness Barr as Marsiglia, with the offenses charged. Under such circumstances no foundation was necessary. If those facts are desired they may be brought out on cross-examination. We cannot take the time or space to review the other objections made, but we have read them and fail to see any error in the rulings thereon.

Appellant Eckelberry also urges the insufficiency of the evidence to support the judgment against him. So far as he is concerned, the testimony of his accomplice Barr shows his connection with the common plan and its execution. A written statement signed by Barr, which Eckelberry verified by his own signature as being true where his name is mentioned, amply corroborates all that Barr said, and shows that this appellant was in the conspiracy from the start, that he furnished the key used to unlock the door of the store, that he watched outside while the burglary was being committed and otherwise took an active part in the affair. In addition, the testimony of Baggett and Ream connects him up in close association, both as to time and parties.

Appellant Lawler urges that the evidence is insufficient as against him because there is no corroboration of the testimony of accomplices Laughlin and Barr. That Lawler knew all about the contemplated plan to obtain the cigars and cigarettes is clear from the testimony of defendant Barr, together with the fact that he was in close association with Barr and Eckelberry both before and after the commission of the crime. This also appears from the testimony of defendant Laughlin, who drove the truck to defendant Denniston's place of business and there unloaded the loot in Denniston's garage, to the effect that about fifteen minutes thereafter Lawler came along and Denniston paid Laughlin $200 for the cigarettes, $50 of which he gave to Lawler; that he, Laughlin, had a conversation with Denniston before the robbery and that Lawler then told Denniston to show Laughlin where he wanted the cigarettes delivered, and that after he abandoned the truck

he went to Lawler's home and there met that defendant and Eckelberry.

Officer Decker testified that Lawler made a statement to him substantially as follows: That on January 26th (the robbery occurring January 29th) he, Lawler, was playing cards with Eckelberry, and that during the second game Eckelberry said to him, "Jim, I have a couple of hundred dollars worth of cigarettes; do you know where I can sell them?"; that Lawler then said, "Over in the blacksmith shop, just kidding him, that's all. . . . So he [Eckelberry] didn't say no more for a little while. I then said, 'There's a wholesale place across the street and I will ask them about it.' The next afternoon I went to Mr. Denniston and told him that a friend of mine had a couple of hundred dollars worth of cigarettes and asked if he could use them. He asked the price and upon being told that he asked if I would make any money myself, and I said, 'Not a nickel.' I told him Eckelberry would let him know. Eckelberry dropped in Saturday night. Mr. Laughlin was with him, and that other man—" "Q. John Barr? A. . . . Yes." "He said, 'This is the guy who's going to get trucks for us,' and I said, 'Not for me.' I said, 'Scotty (John Barr), remember I am not in on this and don't intend to have anything to do with it.' Well, that's all that transpired that night." Even Lawler's attempted denial before "Scotty", in the statement he made to the officer, is an admission that he knew the cigarettes were to be stolen, and in our opinion the admission made is sufficient corroboration of the stories told by Barr and Laughlin, even though this appellant denied that their stories concerning him were true. Such denial was of no weight compared with his own statement, which shows a connection with those defendants and a knowledge of the fact that the property was to be stolen. "It is sufficient if the corroborating evidence tends to connect the defendant with the commission of the offense, though if it stood alone it would be entitled to but little weight. . . . If the connection of the accused with the alleged crime may be inferred from the corroborating evidence in the case it is sufficient." (*People* v. *Yeager*, 194 Cal. 452, 473 [229 Pac. 40, 49].)

The statement was not in any sense an accusatory statement, and was properly admitted as a statement made

by this defendant concerning his connection with the offense charged.

At the argument on defendants' motions for a new trial the court said: "It is a strange thing these gentlemen representing the three defendants who stood trial are arguing a lot of questions whether or not they are guilty when they didn't even take the witness stand. . . . They didn't take the witness stand and deny their guilt. If you want to argue that there was not any evidence at all legally sufficient to show guilt, that is one thing; but to argue that they are not guilty is strange." Appellant Lawler urges that such remark shows that the trial judge was prejudiced by the failure of appellant to take the stand. We fail to find in such language any support for the conclusion that in deciding the case the judge took that fact into consideration at all. He was criticising the arguments made, which were apparently directed toward convincing the trial judge, after the judgment, that the defendants were not in fact guilty, rather than that the evidence did not justify the judgment. The statement of the trial judge was not made as a reason for the decision reached by him; and if it had been, since the judgment rendered seems to be supported by the evidence, it would not make the judgment erroneous. (*People* v. *Hicks*, 115 Cal. App. 314 [1 Pac. (2d) 550].)

Appellant Denniston's trial was continued until after the decision was made in the cases of his co-defendants. At that time Judge Wood, before whom such three cases were tried, evidently feeling that there might be some objection to having him try this appellant's case, called in Judge Fletcher Bowron, whereupon Denniston withdrew his plea of not guilty and entered a plea of guilty to count VI, charging him with the offense of receiving stolen property. He was then granted leave to file application for probation, by Judge Bowron. At that time the district attorney remarked that Judge Wood was familiar with the facts in the case and that he did not know "whether your honor will sit on that matter [application for probation] or want to refer it to Judge Wood". There was some colloquy at this point, during which appellant's attorney stated that since Judge Wood had heard the prior case and had increased appellant's bail from $2,500 to $15,000, his client felt "that Judge Bowron should act in the matter". Judge Bowron

then stated that he would prefer "to have Judge Wood pass upon the matter as he is familiar with the case. The matters will come on in the regular course. I believe that Judge Wood feels, inasmuch as he asked me to come over here in his place today, that if there is any question about his bias or prejudice or feeling in the matter he would want to step aside. If he still feels that way we can arrange to either have the matter transferred to my department in Los Angeles or I can come over here." The matter of probation came on before Judge Wood, no objection having been made by appellant so far as the record shows. No request was made to have it heard by any other judge and no affidavits charging bias or prejudice were filed. Judge Wood denied the application, although the probation officer was apparently favorable to it. Appellant Denniston urges that Judge Wood disqualified himself and could not thereafter further act, and cites several cases which lay down such rule. In the cases cited, however, the judge was legally disqualified by reason of having an interest in the subject matter of the action, or relationship to party or attorney. No such condition appears here, nor did Judge Wood disqualify himself by admitting bias or prejudice in any sense of the words. ▆ That can only be done by so declaring in open court and by causing a memorandum of such declaration to be entered in the minutes. If a judge fails so to declare himself disqualified and a party honestly believes that he is, proceedings must be resorted to by such party under section 170 (5) of the Code of Civil Procedure. We see no merit in the contention.

The judgments and orders appealed from are affirmed.

Craig, Acting P. J., and Stephens, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 26, 1933.