[Crim. No. 1672. Third Appellate District.—June 6, 1939.]

## THE PEOPLE, Respondent, v. JOE SAMBRANO, Appellant.

Charles H. Epperson for Appellant.

Earl Warren, Attorney-General, J. Q. Brown, Deputy Attorney-General, F. C. Clowdsley and Maxwell M. Willens, for Respondent.

THOMPSON, Acting P. J.—The defendant was charged with the murder of Fortunado Jiminez, and with a former conviction of another felony. The defendant admitted the former conviction and the jury found him guilty of murder of the first degree, recommending a penalty of life imprisonment.

The appellant contends the verdict is not supported by the evidence; that there is no evidence of a motive for the murder; that the court erred in admitting and rejecting testimony, and in the instructions which were given to the jury and refused. It is also asserted the district attorney was guilty of prejudicial misconduct in his argument to the jury.

It is conceded that Fortunado Jiminez was atrociously murdered. The identity of his slayer is established only by circumstantial evidence. The record contains slight evidence of a motive on the part of the defendant for the killing of the deceased. We are directed to no substantial evidence of previous trouble between them. We have therefore carefully read the entire record.

The interested parties to the crime are Mexicans. They were farm laborers. The deceased who was apparently an unmarried man had lived in Stockton for several years. Witnesses testified to his good reputation. He had frequently associated with the defendant, Joe Sambrano, who was also known as Joe Boscas. For ten years the defendant lived in Stockton with a Mexican woman named Artemisa Romero to whom he was not married. They had two children. He worked as a farm laborer in that vicinity. He owned an old Ford automobile. In 1928 he served a sentence in San Quentin for grand larceny of an automobile. At the same time another Mexican by the name of Ramon Gomez, *alias* Pablo

Gonzales, *alias* Ferdinando Carbajal was also imprisoned in that institution. During their term of imprisonment the defendant and Carbajal associated as friends. After his discharge from prison Carbajal also moved to Stockton where he lived for some time prior to the homicide. An acquaintance of the defendant and his common-law wife gave to them a heavy beet knife ordinarily used in the fields with which to dig and top beets. This knife was afterwards frequently seen in the defendant's kitchen. Two witnesses, named Camacho and Rojas saw it on the floor of the defendant's automobile near the clutch two or three days before the homicide occurred. It had a loose handle. When he was asked why he carried it in his machine, he replied, "I am going to work too; . . . I am bringing the knife to work, to top beets." When his associate, Camacho, said "That knife isn't any good anyhow, what do you want it for?" he replied "In order to defend myself or kill a cabron." The Spanish interpreter defined the word "cabron" to mean a wild goat, an adulterer, or one who conceals his knowledge of the unfaithfulness of another man's wife. The inference is drawn that the defendant was threatening to kill someone who was guilty of participating in the wife's unfaithfulness.

The three-inch prong or angle usually found on a beet knife, for the purpose of impaling the beet before topping it, had been filed off the long, heavy blade of that knife to make it more suitable for ordinary use about the kitchen. That is why Camacho told the defendant it was not "any good" as a beet knife when he saw it in his automobile. After the homicide it was found in the thicket in the vicinity of the body with blood, human hairs and woolen fabric, like the cloth in the dead man's jacket, upon it. It was positively identified as the knife which was given to the defendant's wife two years previously.

Saturday morning, November 5, 1938, at 10 o'clock, the defendant left his home in Stockton and drove his automobile downtown. He said that he quarreled with his wife that morning; that he bought a cheap tire at a Japanese junk shop and was returning along Center Street when he saw the deceased and his friend Ferdinando Carbajal on the sidewalk talking together; he said both of them got into his machine and asked him to take them to Santa Fe Park to meet a man, whose name he did not remember; that Carbajal then said:

"Well, we go for a ride . . . on some island to look for work"; that the defendant protested but his companions insisted on continuing along the San Joaquin River road towards Holt; that they finally turned on to an unfrequented dirt road that led to the levee and parked their car at the margin of a thick willow grove about 200 feet from the river in an isolated district on Rough and Ready Island; that his companions then got out of the machine and with the remark on the part of Carbajal that "he want to talk with the other fellow", they disappeared in the thicket; that they did not travel more than 75 feet from the machine, and Carbajal was gone only ten minutes, which time the defendant spent in changing a tire; that he could hear them talking and laughing all the time, but heard no outcry or unusual disturbance; that Carbajal came running back to the car and said "Come on, I just killed a s-of-a-b, let's get out of here". The defendant positively identified the man whom he thus charged with admitting the killing of Jiminez, as his friend, Carbajal, from a picture which he was shown in the Los Angeles gallery of ex-convicts.

As a matter of fact there is substantial evidence, which the jury must have believed, that Carbajal did not accompany the defendant and Jiminez Saturday morning on their journey to the fatal willow patch where the murder occurred. Mr. Reyes testified that he saw the defendant drive his machine up to the sidewalk on Center Street the morning of November 5th and wait for the deceased, whom he knew well, to approach; that Jiminez was alone and Carbajal was not with him; that the defendant spoke to the deceased who got into the front seat of the automobile, and they drove away together. Regarding the presence of Carbajal or any other person, the witness was asked: "Q. Was anyone else with them? A. No. Q. Are you sure only the two men were in the car? A. Yes." That fact was corroborated by the wife of the defendant.

When the defendant was brought back to Stockton after his arrest, he was confronted by Carbajal, who had not left Stockton. The defendant then repudiated his former statements to the effect that Carbajal had told him he had killed Jiminez. He merely said he was mistaken; that Carbajal was not the man. Afterwards the defendant said that when Carbajal came running back from the thicket he told him

"He had a fight with Francisco [Fortunado] . . . He run away; he run away." And he added, "Let's go home".

The defendant's wife also corroborated Mr. Reyes in his statement that Carbajal was not with the defendant and the deceased when they drove from the city Saturday morning before the homicide occurred. She was an unwilling witness, but testified that the defendant drove away from home alone that morning, but returned a little later that forenoon "for his clothes and blankets and belongings. . . . he arrived accompanied by Diablito". The deceased was commonly known as Diablito. Mr. Camacho testified to that fact. Evidently the defendant's story about picking up Carbajal and the deceased on the street and driving with them to the willow patch is not true. The time when the defendant and the deceased left home together Saturday forenoon was the last Artemisa Romero saw of her husband until after his arrest. After the homicide, she was shown the picture of the slain man and recognized him as Diablito who was at their home Saturday morning in company with her husband. The fact that the defendant took his clothes and belongings at that time indicates that he did not intend to return. The defendant then wore a brown suit of clothes.

After the defendant left the willow grove where he admits the deceased disappeared, he drove to Modesto, arriving toward evening at the home of an acquaintance by the name of David Padilla, a Southern Pacific section employee. Some other man, whose name he did not mention, accompanied him. Padilla met Carbajal in Stockton and did not recognize him as the man who was with the defendant at Modesto. He may have accompanied the defendant to Modesto. The defendant left that evening, saying he was going to Stockton to get a tire. He drove back to Modesto alone early the following morning, remaining only fifteen minutes and then left his car in the possession of Padilla, saying he was going to Los Banos to pick cotton. He left Modesto that day and beat his way on a freight train to Los Angeles. The defendant claims to have stopped at various places on the way seeking employment and asserts that he did not arrive at Los Angeles until Friday night. That is not true, for his friend Padilla received a postcard from him, dated at Los Angeles, Wednesday, November 9th, asking him to "Do me the favor of covering my car with a linen and just as soon as I can call for it, if

God wills it, I will.'' He had a mother, father, a brother and a sister at Los Angeles, yet he did not let them know of his presence. The defendant was arrested by Los Angeles officers November 28th. He was found hiding in a little shack at the rear of the home of a friend by the name of Solice at 1257 Medford Street on the outskirts of the city. He made a voluntary statement to the officers concerning the homicide and his conduct, which contains many assertions conflicting with other admissions subsequently made by him. Among other significant circumstances, he admitted he was wearing his brown suit of clothes on Saturday when they drove to the willow patch where the deceased was killed. When he was asked where that suit of clothes was he said he bought a suit-case at Modesto and placed the suit and other belongings in it and shipped them to his own address at Los Angeles; that he received the suitcase, but that someone afterward stole it. If he murdered Jiminez in the bloody and gruesome manner that he was killed, that brown suit of clothes could scarcely have escaped from telltale stains. Indeed, the front cushion of his automobile contained a dark spot which an expert witness testified resembled blood.

The body of the deceased was not discovered until November 15th, ten days after the homicide occurred. Mr. Ray Muniz and his friend Mr. Denuit were hunting along the river bank and chanced to pass through the willow thicket on Rough and Ready Island when they discovered the mutilated and partially decomposed body of Fortunado Jiminez and promptly informed the sheriff's office of their discovery.

The deputy sheriff and an assistant visited the premises at once and made a thorough investigation. They found the mutilated body of the deceased in a slight depression in the midst of the thicket about 75 feet from the point where the defendant afterwards said he parked his car. The head and face of the corpse were fearfully gashed. One hand was nearly severed at the wrist, hanging by a mere shred of skin or fiber. The other hand was completely severed and was found some distance from the body. The clothing was cut and slashed in many places and saturated with blood and dirt. There was a spot some distance from the body that was soaked with blood. The adjacent leaves and shrubbery bore evidence of blood stains. The beet knife was found some distance away. It contained dark stains resembling blood, and

several human hairs and woolen fibers similar to those of the jacket worn by the deceased. The handle was covered with a substance that resembled blood. The jacket had been cut in several places.

A few days later the sheriff's office was notified of the Ford automobile which was parked in Padilla's yard at Modesto. The car was recovered and identified as the property of the defendant. The cushion of the front seat contained a spot which resembled blood. The speedometer had a spot which was positively declared to be blood. The beet knife was conclusively proved to be the same one owned by the defendant and seen in his automobile two or three days before the homicide.

The defendant was arrested in Los Angeles and returned to Stockton.

At the trial Doctor John Rosasco, whose qualifications were admitted, and who performed an autopsy on the body of the deceased ten or twelve days after his death occurred, testified that Jiminez died from hemorrhage and shock; that he found:

"About six lacerations on the left side of the scalp, varying in length from one puncture wound which had penetrated into the brain some inch and a half to the longest laceration which was about six inches long. These all penetrated into the periosteum. . . . There was a laceration in which the auricle was almost completely bisected; . . . The face presented a wound, . . . it appeared to course downwards toward the chin, it may have been related or caused by the same instrument that caused the perforation of the skull. The chest cavity, about two and a half inches from the left nipple, at about the same level, showed a small irregular wound, approximately the same size as the one in the head, that penetrated inward into the lung, a distance of about an inch and a half or two inches. . . . There was free blood in the pleural cavity. . . . There was an absence of the right hand, it had been severed through the wrist by something apparently quite sharp. There was a laceration through the ulna side of the right arm, about midway between the wrist and the elbow. The left hand . . . was reversed backwards and hanging by a little more than the skin on the back part. Then there was a wound about six inches from the left elbow which had fractured both bones of the forearm; this was surrounded by several similar lacerations which were not nearly as deep. . . .

210

In addition to that he presented several small contusions and abrasions about both lower legs.''

When the doctor was shown the beet knife and asked, without objection, if such wounds as he found on the body of the deceased could be produced by that weapon, he replied:

''The instrument is quite heavy and has a sharp edge which the instrument of death must perforce have had; and there is also the factor of how viciously it had been handled.''

■ The evidence amply supports the verdict and judgment of conviction. The record precludes any reasonable theory other than that of the guilt of the defendant. It was a fiendish and atrocious murder. It was committed with the defendant's beet knife which was seen in a very accessible place in his automobile a few days before the homicide. He had previously quarreled with his wife and planned to leave home. He admits driving the deceased in his automobile and parking it in a secluded spot at the margin of the dense willow thicket within 75 feet of the place where the body was hidden. His knife with which Jiminez was murdered was found hidden or thrown away in the same copse near the body. It is not reasonable to assume Jiminez was led into the jungle by another person and quietly slaughtered in ten minutes' time within 75 feet of where the defendant says he was changing his tire, without his hearing and knowing of the affray which must have created an unusual disturbance. In spite of the defendant's story to the contrary, satisfactory evidence was adduced that Carbajal was not with them on that death journey. The defendant immediately fled from Stockton, destroyed the clothing which he wore at the time of the homicide, and hid in a shack on the outskirts of Los Angeles. Blood, human hairs and woolen fabric from the jacket of the deceased were found on the fatal knife. Blood was also found on the speedometer of his machine and a spot ''resembling blood'' was also found on the cushion of the front seat. His numerous statements are irreconcilably conflicting and unbelievable.

There is no error in the challenged rulings of the court receiving or rejecting evidence in the course of the trial. The appellant makes twelve assignments of such alleged errors. We are of the opinion none of them has substantial merit.

■ The appellant argues that it is conceded the wound which penetrated the lung of the deceased was not inflicted

by the beet knife, but that upon the contrary it is apparent some other weapon which was not produced at the trial caused that fatal wound. We are pointed to no admission in the record to that effect. The evidence appears contrary to that assertion. After describing the various wounds in detail, including the one referred to in the chest, Doctor Rosasco was shown the beet knife and asked, ''Would such an instrument be one likely to produce the wounds you described?'' To this question he replied, ''It would be possible.'' He was then asked, ''And why do you say that, Doctor?'' And he replied, ''Well, the instrument is quite heavy and has a sharp edge which the instrument of death must perforce have had.'' We construe this language to mean that the doctor believed the chest wound was inflicted by the beet knife. But it is immaterial whether it was so inflicted or not. It does satisfactorily appear that an assault was made on the deceased with the defendant's beet knife, for it contained not only blood and human hairs on its blade, but also woolen fabric which matched the cloth jacket the deceased wore when he was killed. We may not assume the chest wound was the only fatal wound which he received. There was also a wound an inch and a half in length which ''penetrated into the brain''; both bones of the forearm were fractured, and both hands were severed ''by something apparently quite sharp''. The doctor said the wound which penetracted the lung about an inch and a half, being the same depth to which the weapon penetrated the brain, was also ''approximately the same size as the one in the head''. Evidently the doctor believed all the wounds were inflicted by the same weapon. There is ample evidence to prove that the beet knife was used upon the victim, which is material to show that the defendant was the assailant. It is immaterial that the assailant may have also used another weapon to inflict a chest wound which would have also proved fatal.

The court did not err in admitting in evidence the seat of defendant's car, upon the cushion of which there was a dark stain which Mr. Hill testified ''might be blood''. He was first qualified as an expert on that subject by proof of seventeen years' experience in such matters in the sheriff's office. He did not say definitely the spot was caused by blood. We assume the jurors had a right to look at it and decide for themselves whether it was caused by blood. They were the

exclusive judges of the weight of the evidence, and were so instructed. The automobile, including the front seat thereof, was competent evidence. They were employed in the perpetration of the crime. At least, the admission of the seat in evidence was harmless.

The speedometer was properly admitted in evidence. It was a part of the machine used in the commission of the homicide. It contained a spot which was positively identified by the expert witness as blood.

Certain willow leaves which were found in the drip-pan of the automobile, similar to the leaves on the willow trees in the thicket where the body of the deceased was concealed, were admitted in evidence. Since willow leaves are similar in appearance and common to the San Joaquin River and almost every other California stream, it appears that the evidence is of no value. But it is harmless. It was offered to show that the defendant was actually in the immediate vicinity of the willow thicket. He admitted that fact. He showed the officers exactly where he parked the machine within 75 feet of the spot where the body was found.

The court did not err in admitting the statement of the defendant testified to by the officer Romero, without first requiring proof that it was voluntarily made without an offer of reward or a threat of punishment. It was in no sense a confession. The statement contains no admission of guilt on the part of the defendant. He constantly asserted his innocence, and declared that his companion Carbajal disappeared with the deceased in the thicket, and soon came running back and said, "I just killed a s-of-a-b, let's get out of here." The statement was offered as mere admissions, of facts, and not as a confession. No preliminary showing of the voluntary nature of a statement is necessary when it amounts to only admission of facts as distinguished from a confession. (*People* v. *Connelly,* 195 Cal. 584 [234 Pac. 374] ; *People* v. *Wright,* 26 Cal. App. (2d) 197 [79 Pac. (2d) 102] ; *People* v. *Barr,* 134 Cal. App. 383 [25 Pac. (2d) 503] ; *People* v. *Ramos,* 3 Cal. (2d) 269 [44 Pac. (2d) 301] ; 8 Cal. Jur. 115, sec. 205.)

The court did not err in sustaining objections to the defendant's attempt to prove by the witness Mr. Cakebread, for whom the defendant had once worked, the hearsay and

self-serving statements alleged to have been made by the defendant and his brother, who lives in Los Angeles, that the only reason the defendant did not let his parents and relatives know of his presence in Los Angeles was because they condemned his living with a woman without marrying her. These statements were solicited to rebut the theory of defendant's flight from Stockton after the homicide. Mr. Cakebread's evidence of what he may have heard a relative of the defendant say in that regard was hearsay and incompetent. What the witness may have heard the defendant say in that regard was self-serving and incompetent. Moreover, the defendant fully testified to all that was sought to be elicited from Mr. Cakebread in that regard. The rejected evidence regarding the defendant's effort to borrow money from the witness to repair a tire is harmless.

The court did not err in admitting photographs of the willow thicket and the vicinity where the body was found, the beet knife in the spot where it was discovered, and the defendant himself at the point where he voluntarily showed the officers he had parked his automobile at the time of the homicide. The defendant freely admitted that he had taken the deceased in his automobile to that desolate spot, and told them exactly where he parked his car. He voluntarily went with them to identify the spot. His picture was taken while he stood at that point where he said his machine stood. We do not see how that was prejudicial in view of the defendant's admissions. It added nothing to the admission which he had made in that regard. Nor was it prejudicial error to photograph the knife at the spot where it was found and to thereafter offer the picture in evidence. These photographs were received to show the nature of the surroundings where the homicide occurred. Courts are authorized to receive in evidence photographs in the same class as diagrams, when they accurately depict the locality of the crime, together with weapons, objects and physical conditions which are unchanged in status or in relation to other surrounding conditions as shown at the trial by accompanying testimony. (*People* v. *Phelan*, 123 Cal. 551, 564 [56 Pac. 424] ; *People* v. *Crandall*, 125 Cal. 129, 132 [57 Pac. 785] ; *People* v. *Mahatch*, 148 Cal. 200, 203 [82 Pac. 779] ; *People* v. *Grill*, 151 Cal. 592, 598 [91 Pac. 515].) The evidence in the present case conforms ade-

quately to the above stated rule of law. The photographs were not prejudicial.

 The jury was definitely instructed upon all the necessary elements with respect to circumstantial evidence. The rejecting of defendant's proposed charge on that subject was therefore harmless. The instruction which was refused contained only the following principles of law, that the circumstances must show not only that the murder was committed, but also that the defendant himself was guilty of the crime; that the circumstances must be inconsistent "with any other rational conclusion" and should "render probable the theory sought to be established by the prosecution" and "exclude to a moral certainty every other theory but the single one of guilt". That rejected instruction was taken from the case of *People* v. *McClain*, 115 Cal. App. 505 [1 Pac. (2d) 1085], upon which the appellant relies for reversal. The case last cited was reversed because the "equivalent of the rejected instruction" was not given to the jury by the trial court. In the present case every necessary element of the rejected instruction was given to the jury in its charge. In this case the court did instruct the jury that the defendant was presumed to be a man of good character; that he was deemed to be innocent of the charge; that the jury could not base its verdict on "conjecture, speculation, guesses, passion or prejudice"; that the prosecution must prove the defendant's guilt "beyond a reasonable doubt and to a moral certainty". The usual and accepted definition of a reasonable doubt was given. The jury was then clearly informed that the law recognizes two classes of proof in criminal cases, namely, direct and circumstantial evidence; that in the latter class there must be proof "of a chain of circumstances sufficiently strong" to show "the commission of the crime *by the defendant*". That instruction, which was given to the jury, then concluded as follows:

"In order to convict on circumstantial evidence, there should be produced the same degree of certainty as that which arises from direct testimony and excludes all rational probability of innocence. *The circumstances should be of such a nature as not to be reasonably accounted for on the theory of the defendant's innocence, but perfectly reconcilable with the theory of the defendant's guilt.*"

The rejected instruction was therefore sufficiently covered by other ones which were given to the jury, and its refusal was not erroneous. The frequent repetition of principles of law in the court's charge is often confusing and harmful. In the interest of brevity and clarity, the charge to the jury should be as concise as may be consistent with the issues necessarily involved and the protection of the rights of the accused person.

That deleted portion of defendant's instruction which declares the laws are made for the protection of the innocent as well as for punishment of the guilty was elsewhere clearly given to the jury in other instructions. The omitted portion merely reiterated the principle that the defendant could not be convicted unless the jury was "fully satisfied" of his guilt.

It was not error to reject the defendant's proposed instruction to the effect that the good character of the defendant, if it was satisfactorily established, should be considered by the jury throughout its deliberations, and that if they entertained a reasonable doubt of his guilt this evidence of his good character would be sufficient ground for his acquittal. This instruction is the converse of a similar one which was taken from *People* v. *Mitchell*, 129 Cal. 584, at page 587 [62 Pac. 187]. In the last-mentioned case the jury was instructed that in spite of the established previous good character of the accused person "If the evidence convinces you beyond a reasonable doubt of defendant's guilt, you must so find, notwithstanding his good character". The only portion of the instruction in the Mitchell case which was criticized by the appellant or considered by the court on appeal, was the language above quoted. The balance of that instruction was not involved on that appeal. In that case the defendant was convicted of murder, and the judgment was affirmed.

In the present case every essential element of the rejected instruction was given in other instructions to the jury. The court charged the jury that "The character of the defendant is presumed to be good"; that they could not convict him unless they were satisfied *from all the facts and circumstances of the case* that he is guilty "beyond a reasonable doubt and to a moral certainty". Moreover, the challenged instruction is argumentative and therefore objectionable.

The appellant also complains of the refusal to give his proposed instruction number 14, which also informs the jury they must take into consideration the good character of the defendant in determining his guilt or innocence. It then discusses the reasons why such evidence of good character should be considered, concluding with the statement that evidence of good character is competent on the theory "that there is some mistake or misrepresentation in the evidence on the part of the prosecution". We are of the opinion the essential part of this instruction was also sufficiently covered by others which were given to the jury on the general charge. In spite of the fact that the giving of the same instruction was held in the case of *People* v. *Ridgeway*, 80 Cal. App. 615 [265 Pac. 349], not to constitute reversible error, and that the court failed to consider or discuss the argumentative character of the charge, we are convinced it is objectionably argumentative. The trial court should not unfairly cast suspicion upon the character of the evidence of either the prosecution or the defense by intimating that it might contain "mistakes or misrepresentations". At least the jury was informed in other instructions that it should consider every essential fact and circumstance in the case, and acquit the defendant unless it was fully satisfied of his guilt. The refusal to give that instruction was not prejudicial or erroneous.

Defendant's instruction number 16, the refusal of which is assigned as error, was fully covered by instruction number 10, which was given, on the subject of the alleged absence of proof of a motive for the crime on the part of the defendant. The jury was correctly instructed that if the guilt of the defendant was completely established, the lack of proof of a motive for the crime was "unimportant"; that when a doubt of the defendant's guilt is entertained, proof of the presence or absence of a motive becomes valuable and should be considered; that motive may be shown by positive evidence or by surrounding circumstances, and finally that absence of proof of a motive "is equally a circumstance in favor of the accused to be given such weight as the jury deems proper". That instruction is not criticized by the appellant. It is approved in *People* v. *Garcia*, 2 Cal. (2d) 673, 683 [42 Pac. (2d) 1013]; *People* v. *Durrant*, 116 Cal. 179, 208 [48 Pac. 75], and the essential elements are supported in the text of 8 California Jurisprudence, page 329, section 377.

■ The district attorney was properly permitted to cross-examine the witness, Mr. Oakebread, who had testified that the defendant previously bore the reputation of being a "peaceful and law-abiding citizen", as to whether he knew the defendant was a paroled prisoner from San Quentin; that he subsequently pleaded guilty to a charge of "car prowling" in Stockton and served a sentence of 180 days in the city prison. It is not disputed that both of those convictions against the defendant occurred. They tended to refute the claim that he had a good reputation as a law-abiding citizen. The witness admitted he had heard of neither conviction but insisted that he still believed his reputation in that regard was good "under the conditions that I knew him". Evidently the witness understood the question to refer to his personal opinion of the defendant's character as distinguished from his general reputation. The cross-examination by the prosecuting officer in that respect was evidently conducted in good faith. The rule is well established that, in the absence of bad faith, a witness who has sworn to the good reputation of an accused person for peace and quiet or for truth, honesty and integrity, may be asked on cross-examination whether he knows of and takes into consideration specific acts and conduct inconsistent with the reputation attributed to him, when such acts actually occurred or when the examining attorney, in good faith, believed that the defendant was guilty of them. (*People* v. *McKenna*, 11 Cal. (2d) 327, 335 [79 Pac. (2d) 1065]; *People* v. *Stevens*, 5 Cal. (2d) 92, 99 [53 Pac. (2d) 133].)

■ The jury was not precluded from fairly considering the question as to whether it should find the defendant not guilty on account of the failure of the court to first include among the forms of verdicts handed to it, one drawn on the theory of his innocence. The defendant was not prejudiced by that omission. That form of verdict was given to the jury before it began consideration of the evidence. The record clearly shows that after the evidence was closed and the arguments completed, the court informed the jurors with respect to various forms of verdicts which they should consider. The court said:

"If after a consideration of all the evidence in the case, the jury entertain a reasonable doubt as to defendant's guilt, then I charge you it will be your duty to acquit him."

The court then read and handed to the jury the various forms of verdicts, omitting the one of acquittal, which was overlooked. After formal instructions regarding the selection of a foreman, agreeing upon a verdict by unanimous vote and the signing of that verdict by the foreman, they were directed to retire and consider their verdict. It does not appear that the jury had even retired from the court room. The record merely shows that the case was submitted to the jury at 9:50 o'clock A. M. and at 9:55 A. M. the court reconvened and said:

"When the court was instructing the jury as to the form of their verdict, inadvertently I omitted to read you one with reference to not guilty. Should the jury conclude that the defendant is not guilty, then the following shall be the form of your verdict."

That form of verdict was then read and handed to the jury. The jury was then told to retire and to enter upon its deliberations. ■■■ In the absence of a showing to the contrary, we must assume all proper forms of verdicts were placed in the hands of the jury before it actually began its deliberations or consideration of the guilt or innocence of the defendant. But even though the jury did retire and was recalled into court and given the verdict of not guilty within five minutes after it retired, the defendant could not possibly be prejudiced thereby. (*People* v. *Woods*, 147 Cal. 265, 273 [81 Pac. 652, 109 Am. St. Rep. 151].)

The defendant was accorded a fair and an impartial trial. There appears to have been no miscarriage of justice.

The judgment and the order denying a new trial are affirmed.

Bruton, J., *pro tem.*, and Tuttle, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 6, 1939, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 6, 1939.