[Crim. No. 2236. First Dist., Div. One. May 20, 1943.]

THE PEOPLE, Respondent, v. GIN SHUE, Appellant.

626

Nathan Coghlan and Chellis Carpenter for Appellant.

Earl Warren, Attorney General, Robert W. Kenny, At-

torney General, and David K. Lener, Deputy Attorney General, for Respondent.

PETERS, P. J.—Appellant was tried and convicted of being in the unlawful possession of opium in violation of section 11160 of the Health and Safety Code. He has appealed from the judgment of conviction and from the order denying his motion for a new trial. In addition, based on facts alleged to have occurred subsequent to the date the appeal was perfected, he has petitioned this court to grant a new trial, or to remand the case to the trial court with directions to repass on the motion for a new trial.

The evidence produced at the trial supports the implied finding of the jury that appellant, at the time and place charged in the information, was knowingly in the unlawful possession of a quantity of opium and smoking equipment. In the early evening of January 9, 1942, Sergeant Manion and Officer O'Connor of the San Francisco Police Department, regularly assigned to the Chinatown detail, entered the premises of appellant on Sacramento Street, San Francisco, without a warrant. These premises consist of several rooms. Immediately from the street there is a large storeroom; from this room there is a door leading to a fairly large room frequently used by the appellant as a sleeping room; a door, in turn, leads from this room to a small office containing a desk and filing cabinet. The officers were admitted to the premises by appellant. Sergeant Manion remained in the sleeping room and Officer O'Connor and appellant proceeded into the small office. The officer discovered a valise shoved under the desk. The officers testified that when O'Connor reached for the valise appellant grabbed for it and told O'Connor not to open it. While O'Connor and appellant were struggling over the valise Sergeant Manion instructed O'Connor to give possession to appellant. The appellant, according to the officers, then grabbed the valise and ran towards the door to the bedroom. He was there seized by Sergeant Manion and he and O'Connor took possession of the valise and handcuffed appellant. When the valise was opened it was found to contain 445 grains of a preparation of opium and valuable smoking equipment, the contents being of a value of in excess of $500.

Appellant admitted that the valise and its contents were

found on his premises. He denied struggling with the police over its possession, and testified that immediately after his arrest he told the officers that the opium and smoking equipment were not his property. The police officers admitted that he had so stated but testified that appellant did not then, or at any other time, inform them of the name of the owner of the valise and its contents. At the trial the defense of appellant was that while the valise was found in his possession, he did not own the same and did not know what it contained. In support of this defense he produced several witnesses. Attorney Pomeroy, who has known appellant for many years, and who has acted as his attorney in civil matters, testified that he visited appellant's premises on the afternoon of January 7, 1942, and was talking to appellant in the storeroom when two Chinamen entered; that one was carrying a satchel or valise which he testified was the valise here involved, and the other was carrying a roll of blankets; that they talked with appellant who motioned towards the back room. He described the man who was carrying the valise as being rather elderly, "very slender and a peaked face" and over seventy years of age. Hong Tuei Gin, a cousin of appellant, testified that he operated a laundry in San Francisco; that some time prior to January, 1942, he permitted an elderly cousin by name Gin Ti (or Tie or Tai) to live on the laundry premises; that several days before appellant's arrest he accompanied Gin Ti to the premises of appellant; that Gin Ti was then carrying the valise here involved, and he, the witness, was carrying a blanket roll; that he saw Pomeroy at appellant's premises when he entered; that Gin Ti asked appellant if he could leave his valise and bed roll on the premises while he went across the Bay to look for work; that appellant consented, whereupon Gin Ti walked into the inner office and placed the valise under the desk.

Appellant took the stand in his own defense and testified that the valise belonged to his cousin Gin Ti, and that he, appellant, had no knowledge of what it contained. He described his cousin substantially as did Pomeroy and Hong Tuei Gin, and told the same story as did those witnesses. Gin Ti was not produced as a witness at the trial.

On this evidence, on proper instructions of the trial court, there was submitted to the jury the question as to whether appellant had knowledge of the contents of the valise while it was in his possession. The jury found him

guilty. There is no doubt that the evidence supports the inference that appellant was unlawfully in possession of the opium, although it would likewise support a contrary finding. Under such circumstances, this court has no power to disturb the judgment on the ground of insufficiency of the evidence. (*People* v. *Turco,* 104 Cal.App. 59 [285 P. 349]; *People* v. *Tedesco,* 1 Cal.2d 211 [34 P.2d 467]; *People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778]; *People* v. *Frahm,* 107 Cal.App. 253 [290 P. 678].)

On the motion for a new trial appellant offered several affidavits including one signed by Gin Tie, sometimes spelled Ti or Tai. In this affidavit Gin Tie stated that several days prior to January 9, 1942, he had brought a suitcase or valise containing opium and smoking equipment to the premises of appellant and had left the same under the desk in the inner office. He averred that he did not inform appellant of the contents of the valise. His description of this transaction, and his description of the contents of the valise, were substantially similar to those given by appellant and his witnesses at the trial. In addition to the affidavit, appellant's cousel offered to produce Gin Tie as a witness on the hearing of the motion. This was done, and Gin Tie was produced as a witness, a practice well justified by the circumstances. On direct and cross-examination Gin Tie testified in detail as to the circumstances under which he left the valise under the desk, and described in detail the valise and its contents. On redirect examination the valise that had been found under the desk was exhibited to the witness, and he positively denied that it was his. The trial court thereupon denied the motion for a new trial.

On the same day that appellant's closing brief was filed on this appeal, appellant also filed a petition to remand the case to the trial court for a new trial or to remand the case to the trial court to pass again on the motion for a new trial. It is appellant's contention that since the appeal was perfected new evidence has been discovered which warrants the granting of this extraordinary relief. The allegedly newly discovered evidence consists of a new affidavit by Gin Tie. This affidavit states that the affiant, in fact, placed the valise containing the opium and smoking equipment under the desk in question as described by the witnesses, and frankly and directly states that his testimony given on the

motion for a new trial that the valise exhibited to him was not his, was false; that in fact the valise belongs to him, and that it is the one deposited by him under the desk on appellant's premises.

It is apparent that this court has no power to grant the petition. There is no contention that the prosecuting officials conspired or participated in producing or knowingly or otherwise produced perjured testimony. The allegedly perjured testimony was produced by appellant. In the absence of an allegation of participation by the court or the prosecuting officials in the production of the allegedly perjured testimony there is no power in this court on this appeal (or on habeas corpus) to go beyond the record on appeal. By the Constitution (art. VI, § 4b) the jurisdiction of this court in such a case is limited to considering the appeal or to issuing a writ of habeas corpus. A motion or petition such as is here involved may not be substituted for an appeal. So far as our appellate jurisdiction is concerned we are limited to the record on appeal. We have no power to consider the petition.

██ On the appeal it is urged that the information does not conform to the requirements of sections 950, 951 and 952 of the Penal Code. Those sections require that the information charge the offense in ordinary and concise language, understandable to a person of common understanding; that it contain, substantially, a statement that the accused has committed a public offense; that it may be in ordinary and concise language with no necessity for technical averments; that it may be in any words sufficient to give the accused notice of the offense with which he is accused.

The information in the present case is worded as follows: "Gin Shue, is accused by the District Attorney of the City and County of San Francisco, State of California, by this information, of the crime of FELONY, to-wit: Violating Section 11160 of the Health and Safety Code, committed as follows: The said Gin Shue, on or about the 9th day of January, A. D. nineteen hundred and forty-two, at the City and County of San Francisco, State of California, did then and there wilfully, unlawfully and feloniously have in his possession a preparation of opium; contrary to the form, force and effect of the statute in such case made and provided.

and against the peace and dignity of the People of the State of California."

Section 11160 of the Health and Safety Code as amended in 1941 provides that it shall be unlawful to possess a narcotic except upon the written prescription of a licensed physician, dentist, chiropodist or veterinarian. Section 11001 includes opium within the definition of "narcotics," and section 11002 provides that the term shall also include a salt, derivative or compound of a narcotic. In *People* v. *Bill*, 140 Cal. App. 389 [35 P.2d 645], in connection with a contention similar to the one here made it was stated (p. 391): "The information sufficiently charges the defendant with the offense of having possession of cocaine contrary to the provisions of the statute above referred to. The information refers to the act by quoting the title thereof and then alleges that the defendant, on the twenty-sixth day of January, 1934, in the county of Sacramento, California, 'did then and there wilfully and unlawfully and feloniously have in his possession a preparation of cocaine; contrary to the form, force and effect of the statute . . . ' . . . The information is couched in the language of the statute and conforms to the provisions of sections 950-952 of the Penal Code. It sufficiently informs the defendant that he was charged with the unlawful possession of cocaine." (See, also, *People* v. *Smith*, 54 Cal.App.2d 587 [129 P.2d 732].) The information here challenged was sufficient.

Appellant next objects to certain rulings of the trial court made on the direct and cross-examination of certain character witnesses presented by him. During the trial, and before he took the stand in his own defense, the appellant presented ten persons as character witnesses. All were substantial and responsible men in the community. The record shows that on the direct examination of these witnesses considerable confusion existed in the minds of the court and counsel as to the proper extent of the examination. The court finally ruled that the witnesses could be asked as to their knowledge of the general reputation of the accused for the traits involved in the charge of possession of opium. The following are examples of the type of questions asked these witnesses. The witness Pomeroy, an attorney at law, was asked, "Do you know the reputation of the defendant in this case as one who would or wouldn't have in his possession

a contraband of this kind?" (R.T. 70.) During the examination of the witness Burns, a notary public, after he had testified as to his acquaintanceship with the accused, the following occurred: "Q. [By appellant's counsel] Mr. Burns, the defendant here is charged with having in his possession a preparation of opium. Just how to place the trait here involved, we are at a bit of a loss. Do you know what his general reputation is in this community for dealing—The Court: For the traits involved. Mr. Coghlan: Q. For the traits involved. You can derive what they are from the charge. The traits which may be involved in a charge of this character, to-wit, possession of narcotics . . . Mr. Coghlan: Q. Do you know what his general reputation is? A. Good; his general reputation is good." (R.T. 88 and 89.) The witness Stidger, an attorney at law, was asked: "Q. Do you know what his general reputation is in this community for the traits that are involved here? He is here charged with having possession of opium, a preparation of opium." (R.T. 94) The witness Charles T. Hughes, an insurance broker, after testifying as to his familiarity with the accused, was asked: "You know then what the reputation of this defendant is for the traits that are here involved. You understand he is charged with having possession of a preparation of opium." (R.T. 97) The witness Lee Song, a restaurant proprietor, was first informed that appellant was accused of having possession of a preparation of opium, and was then asked: "Do you know in relation to having opium in his possession—do you know whether he is a good man or a man—whether his general reputation is good or bad?" (R.T. 104) The witness Hickey, assistant superintendent of railway mail with the Post Office Department, was asked: "I will tell you what this charge is. They have charged him with the possession of a preparation of opium. I am going to ask you if you know what his reputation, general reputation in this community is, for the trait here involved? I take it that the charge—from the charge itself you can infer what the traits are. Do you know what his reputation is?" (R.T. 109) And again, "Do you feel you know what his general reputation is for these traits?" (R.T. 110) Arthur J. Fritz, a custom house broker, was asked if he knew the appellant's reputation for "the traits that are involved here" (R.T. 140), to which he answered, "No." He was then asked if

he knew the appellant's "general reputation for truth, honesty and integrity?" (R.T. 141) The witness B. K. Chan, manager of the Mandarin Theatre was asked: "Do you know what his general reputation for truth, honesty and integrity, and his reputation for the traits that might be involved in a charge of possessing opiates—what that reputation might be, or what it is in Chinatown, in the community?" (R.T. 144) Some confusion arose in the questioning of the witness Lee Sing Hing, a merchant and member of the board of directors of the Six Companies and of the Chinese Chamber of Commerce. The Court finally suggested: "Why don't you ask him the general question, if he knows the general reputation of this man for the traits involved, that is, the possession of opium?" He was then asked: "Do you know what his general reputation is in this community for the traits that are here involved? . . . He is charged with having in his possession a preparation of opium." (R.T. 196) These questions fairly typify those asked of the witnesses on this subject. All of the witnesses (except the witness Fritz) tesified that they did know the appellant's reputation for the traits involved, and that it was "good" or "excellent." On cross-examination some of these witnesses were asked, in varying forms, whether they had heard that the appellant had been arrested or charged with the crimes of possession of a still and manufacture of whiskey, of visiting a gambling place, of conducting a gambling place, and of vagrancy. Several of them were also asked whether they had heard that the appellant had paid a certain Tom Sing Sue a sum of money for the purpose of engaging in a narcotic transaction. Objections to these questions were overruled, and the witnesses, with one or two minor exceptions, answered in the negative. On redirect examination several of the witnesses were asked if they had heard of a different explanation of the Tom Sing Sue transaction than had been referred to by the prosecutor. Objections were sustained. Appellant now urges that it was prejudicial error to permit the prosecutor to ask the character witnesses whether they had heard of these specific acts of misconduct of the accused not connected with the specific charge for which he was on trial. It is appellant's position that on direct examination he was specifically limited to interrogating the witnesses as to their knowledge of the reputation of the accused for

possessing opium. We do not so interpret the questions. The witnesses were asked as to their knowledge of the reputation of the accused in relation to the traits involved in the offense charged. Included within that question, as would be true with any criminal charge, is necessarily the trait of being a law abiding citizen. The questions were awkwardly phrased it is true, and it would have been better practice to have informed the witnesses more specifically of the traits involved, but it is our opinion that the witnesses, on direct examination, were not unduly limited or misled. The record indicates that they understood that appellant's reputation as a law abiding citizen was the subject of the inquiry.

It is well settled, of course, that the reputation of the defendant as to his character is within the scope of legitimate inquiry by the defendant. This means that the defendant may produce witnesses who may be questioned as to their knowledge of the reputation of the defendant as a law abiding citizen. When a witness has so testified, the credibility of that character witness is placed in issue. ▮ One way to test the accuracy and weight of the statement of the witness as to the existence of the good reputation of the accused is for the prosecution, in good faith, to ask the witness whether he has heard of certain rumors, occurrences or charges as to specific acts of misconduct of the accused relating in general to the traits involved in the charge, including the reputation of the accused as a law abiding citizen. The prosecution is confined to the answer given by the witness, and can inquire no further into the matter. In other words, the defendant's general misconduct cannot be inquired into by either the prosecution or defense as a fact—the question is as to the good reputation of the accused, and as to the credibility of the witness who testifies that that reputation is good. (Wigmore on Evidence, 3rd ed., §§ 197, 988; *People v. McKenna*, 11 Cal.2d 327 [79 P.2d 1065]; *People v. Stevens*, 5 Cal.2d 92 [53 P.2d 133]; *People v. Tedesco*, 1 Cal.2d 211 [34 P.2d 467]; *People v. Hernandez*, 47 Cal.App.2d 132 [117 P.2d 394]; *People v. Sambrano*, 33 Cal.App.2d 200 [91 P.2d 221].) If the trial judge is so requested, he should instruct the jury that the prosecution's questions do not prove the existence of the fact of the misconduct, and that the existence of such fact is not an issue in the case—it merely has relevancy on the issue as to the credibility of the character witness if he admits knowledge

of the misconduct. No such instruction was asked here.

The cross-examination by the prosecution concerning the knowledge of the witness of specific acts of misconduct must be in good faith. (Wigmore on Evidence, 3d ed., § 988.) The prosecutor is not permitted to show his good faith by offering evidence of the truth of the specific acts of misconduct which are the subject of the question, because that would be to place in issue the truth of that charge, a purely collateral matter. The lack of good faith must be proved in some way other than by the failure of the prosecution to substantiate the collateral charge. (*People* v. *Sambrano,* 33 Cal.App.2d 200 [91 P.2d 221]; *People* v. *Hightower,* 65 Cal.App. 331 [224 P. 110]; *People* v. *Burke,* 18 Cal.App. 72 [122 P. 435]; *People* v. *Gordan,* 103 Cal. 568 [37 P. 534]; *People* v. *Burns,* 121 Cal. 529 [53 P.1096].) The trial courts possess adequate powers to restrain an abuse of this privilege.

It follows that since the questions on cross-examination reasonably related to the knowledge of the witness as to the reputation of the character of the accused as a law abiding citizen they were proper.

The above analysis also applies to the questions sought to be asked on redirect concerning the transaction with Tom Sing Sue. When the witnesses answered on cross-examination that they had not heard of the transaction as described in the questions of the prosecutor that ended that inquiry. The question as to whether such charge was true or false was not in issue. Neither the prosecution nor the defense can be permitted to elicit evidence as to the truth or falsity of such collateral matters. It would have been improper to have permitted appellant to elicit information relating to the nature of the transaction in question.

The petition is dismissed; the judgment and order appealed from are affirmed.

Knight, J., and Ward, J., concurred.

A petition for a rehearing was denied June 4, 1943, and appellant's petition for a hearing by the Supreme Court was denied June 17, 1943. Carter, J., and Schauer, J., voted for a hearing.