[Crim. No. 3773.   Second Dist., Div. Three.   Aug. 30, 1944.]

THE PEOPLE, Respondent, v. PETER ORLOFF et al., Appellants.

Frederic H. Vercoe, Public Defender, William B. Neeley, Deputy Public Defender, and Mark F. Jones for Appellants.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

BISHOP, J. pro tem.—Each of the defendants was found guilty, by a jury, of robbery in the first degree, and each has appealed from the order denying him a new trial and from

the judgment of conviction. If we remove from the scales that evidence on the People's side which is there through errors, we find the evidence remaining, as to the three defendants other than Alvarez, so evenly balanced that the errors appear prejudicial, necessitating, as to them, a reversal of the judgment and of the order denying them a new trial, and as to Alvarez we find a total lack of evidence.

The evidence established beyond doubt that early in the morning of the 18th of February, J. Lynn Avery was robbed of over $8,000 in cash, and of a still larger sum in checks, by the .concerted action of three men. The robbery took place at a little shack, located on the south side of Water Street, in Wilmington, at a point opposite the southerly end of Avalon Street. As Avery was unlocking his shack, where he carried on the business of cashing checks, the three men drew close to him. One of them stated "We want some money." Then he was struck a blow on the head, the bag containing the cash and checks was grabbed, and Avery's further observations were limited to watching his bag "run" across Water Street and up the sidewalk of Avalon Street, where it disappeared from his view. Avery identified defendant Grijalva as one, defendant Orloff as another, of the three men who robbed him. He saw no bludgeon, gun or other weapon at any time throughout the incident.

There was no other witness who testified concerning the actual robbery. A marine electrician, Boomershine, who was drinking coffee at a stand not many feet from Avery's shack, first knew that something unusual had occurred when he saw Avery trying to get up off his knees. He then ran around Avery's shack and saw two men running across Water Street and north on Avalon. These men, he testified, were defendants Grijalva and Mack. At or about this same moment witness Gonzales, who was on the north side of Water Street, east of Avalon, saw some men running, one of whom he identified as defendant Grijalva. Neither Boomershine nor Gonzales reported the presence of a gun of any description in the hands or possession of any of the defendants or of any of the men they saw running.

The identification of the three defendants so far mentioned was not as positive as our recital of the evidence up to this point might indicate. It appears that the robbery took place

at 7:20 a. m. of February 18th. Due to the hour, and an overcast sky, visibility was not good. It was half-light, Avery stated, and a stranger could not be seen clearly enough so that he could be identified at a distance as great as 60 feet. If he was right in this, then Gonzales and Boomershine were too far away from the running men to be able to state, honestly, that they recognized two of them when they saw the three defendants, two months later, in the line-up. In ways too many and unnecessary to mention, the value of Gonzales' and Boomershine's testimony was lessened by statements they were induced to make. In some details of significance they disagreed with each other, and Boomershine and Avery were not in accord. Each of the defendants testified that he was nowhere near Wilmington on the day of the robbery. The jury might, even without doubting Avery's desire to tell the truth, have entertained a doubt of his identification of Grijalva and Orloff. He had never seen them before the swift seconds during which he was accosted, struck and his bag began running. The jury had a basis in the evidence for concluding that he was not sure of his identification at the line-up, some seven weeks later. When, at the preliminary examination, he was asked if he had since seen the one who had demanded the money, he replied: "I believe I have"; and later, "I think it is that gentleman," indicating Grijalva. The evidence thus far noted is legally sufficient to support the convictions of Alvarez' three codefendants but is not so strong that it can save those convictions from the blight of serious error. Of course, it entirely fails to connect defendant Alvarez with the robbery.

Defendant Alvarez, however, made some six extrajudicial statements, which served to implicate him as an aider and abettor. (*People* v. *Soffer* (1939), 34 Cal.App.2d 301 [93 P.2d 183].) The main contention made to us on his behalf is that it was error to receive "his confession," because it was not free and voluntary, in that it was induced by a promise and was coerced by the use of some force. In support of this contention an argument is made based in large measure upon Alvarez' testimony, which was in greater part contrary to that of other witnesses, and in part hard to believe, so that it may well have been rejected in its entirety by the trial judge and jury. It is futile to support an argument on appeal upon

a theory of events that is in conflict with the facts which it is clear the jurors and the trial judge found to exist, from the evidence before them. There remains, however, after we remove from consideration the evidence which was contradicted and discredited, enough to present a problem which is vital to Alvarez' appeal.

The robbery remained unsolved for at least six weeks after its commission. Then, apparently, the police were given a tip by Alvarez' father-in-law and wife. He was arrested and questioned. At first he denied any knowledge of the robbery, but later, and on several occasions and to various persons, he stated that he had been approached by some men who had a little job to do at San Pedro or Wilmington, by which he understood that they meant a robbery, and who asked him to drive them to and from the mission they were to undertake. He accommodatingly drove them where they directed, backed the car at an angle to the curb on Avalon, not far from Water Street, and when they came running back made a quick getaway. The date, hour and place all corresponded to Avery's robbery, and some $8,000 of cash and a like amount of checks were obtained. The men for whom Alvarez drove were named by him; they were ''a man by the name of Mack . . . a Russian by the name of Orloff and a fellow by the name of Grijalva.'' One carried a sawed-off shotgun, another a 38 caliber automatic, the third a 25 caliber automatic. Alvarez received $600 out of the cash which was divided among the three active perpetrators of the robbery. He knew their places of residence closely enough so that the three were soon taken into custody.

The first self-inculpatory statement made by Alvarez was to Officer Houghton, some little time after his arrest. Alvarez, it appeared, had cause to believe that his wife had spoken, and he was in great fear that Mack would be revengeful. Officer Houghton, according to that officer's testimony, said to Alvarez, before he admitted any part in the robbery, ''now, Alvarez, we want to help you.'' We quote further from the officer's testimony: ''I said to him, you have admitted you were in trouble. We want to straighten this out for you. He said, I want to get it straightened out. I am willing to co-operate. I said, that's what I want you to do. He said, one thing I'm afraid of is my life and the life of my wife and baby, and I want them protected. I told him the only way he

could protect the life of himself and wife and baby was to clean up the situation he had been in. He said he was willing to help. He then related to me, or I'll say this, I asked him then who was involved. He said myself and Red Mack and a fellow by the name of the Russian, and a guy by the name of Art. . . . he said, you don't know that Guy Mack. He said, he'll get my wife and baby. I said, not if you will cooperate.''

Officer Houghton's account of the conversation he had with Alvarez leading up to the confession, stands uncontradicted save by Alvarez' own testimony, which, if credible, would render the ''confession'' still less entitled to the jury's consideration. When the motion to strike was made and denied, only the officer's version of the conversation was before the court. The only reasonable inference to be drawn from that conversation is that as a result of it, a promise was held out, to Alvarez, by an officer of the police department, that the department would help Alvarez in his desire to protect his wife and child from harm at the hands of Mack if, and only if, he (Alvarez) would ''cooperate''; that he must ''clean up the situation he had been in.'' Put bluntly, that which was to be done to protect Alvarez' wife and child, and Alvarez himself, from Mack's wrath, was to bring about Mack's arrest and incarceration, and that could only be done by a statement of events Alvarez knew, and so was implicated in. The citation of authorities is not needed to support the conclusion that a confession so obtained should not have been allowed to remain before the jury. (See § 202, Criminal Law, 4 Cal.Jur. Ten-year Supp., 1943 rev.) A powerful inducement was held out to obtain it, one which would be likely to draw out a ''confession'' whether true or false. It was error not to grant the motion to strike. ■■ To ''protect the record'' motions to strike the other reported repetitions of this first confession should have been made, but the failure to make them may be excused by the futility of doing so in the face of the ruling which was made.

■■ The testimony of three witnesses covering the statements Alvarez had made, not in the presence of any of the three codefendants, was, as to them, plainly hearsay. This all parties realized and the jurors were instructed to hear those statements only as to Alvarez, to close their ears to them as regards the other defendants. But such is the construction

of the human auditory organs that the fact that the jurors heard that Alvarez had said that Orloff, Mack and Grijalva planned and carried out a robbery, having at hand a sawed-off shotgun, and a 38 and a 25 automatic, and that each got away with his share of the cash which the robbery produced, must be kept in mind as we weigh the errors now to be considered.

Immediately after Alvarez gave to Officer Houghton the names and residences of his three acquaintances, Orloff, Grijalva and Mack, they received callers. Officer Houghton obtained entrance to the room, in a suburban Y.M.C.A., which was occupied jointly by defendants Orloff and Grijalva. Defendant Orloff was there when his visitor arrived, at 3:00 a. m., and Grijalva came in a half hour later. Both were placed under arrest and their room and persons searched. Officer Houghton was permitted to testify, over timely and insistent objections, that in a trunk near defendant Orloff's bed he found twenty-four twenty dollar bills and two new pairs of shoes and, in a closet, some new clothes. The defendant Grijalva was found to possess $39 and a diamond ring for which he had paid, according to a receipt found on his person, $150. None of the twenty dollar bills was identified as having been in Avery's possession, although some of the bills taken from him were of that denomination, and of course there is not even a claim that the other articles were ever Avery's.

In *People* v. *Kelly* (1901), 132 Cal. 430, 431 [64 P. 563], we find this expression of the principle which justifies, in proper cases, the admission of evidence of the nature of that just referred to: ''Generally, evidence of the wealth or poverty of a defendant is not admissible; but the sudden possession of money, immediately after the commission of a larceny, by one who before that had been impecunious, is clearly admissible as a circumstance in the case.'' But in this case there was no attempt to prove, prior to the receipt of Houghton's testimony, that either Orloff or Grijalva were so short of funds, before the robbery, that the possession by either of them of the money and goods they were found to have would, after the robbery, justify an inference that they had had some part in it. Nor was the error cured by the receipt thereafter of any evidence that revealed that they had been financially

embarrassed before Avery's misfortune occurred. The People, in support of the ruling, state: "the rule has been liberalized in late decision." They refer to no authority save the case of *United States* v. *Jackskion* (1939), 102 F.2d 683 [123 A.L.R. 116], and to the annotation following it in 123 A.L.R. 119. We find nothing in the case cited, nor in the annotation (which lists *People* v. *Kelly, supra,* 132 Cal. 430 [64 P. 563], as the California case in point), to justify the admission of evidence of affluence without a showing of prior impecuniousness.

██ Other errors of even greater prejudice followed. In telling Officer Houghton about defendant Mack, Alvarez stated, according to the officer, that "Red Mack will never be taken alive. He is going to be a tough customer . . . all the guns are kept at that house." Defendant Mack failed to live up to this advance, and erroneously admitted, notice, however; he and his wife were arrested without incident. ██ A search of his house at the time of the arrest disclosed the presence of an unloaded shotgun behind a dresser, and nothing more. Over timely objection, this shotgun was received in evidence. Three or four hours later a further search was made by Officer Temple, and at various places these articles were found, and, over objections, received in evidence: a sap; a 25 automatic and the clip with which it was loaded. Eight days later another search was made and a loaded sawed-off shotgun was discovered concealed in a chest of drawers. This too was received in evidence. In addition to these weapons, a 38 caliber "bulldog" revolver, found in the bedroom of defendant Alvarez, was admitted. This array of weapons could not fail to make an impression on the jury. Not one in the collection was shown to be connected with the robbery by any evidence which was binding on the defendants Orloff, Grijalva and Mack. The statement in the brief of the People that Alvarez testified concerning the presence of three of the weapons upon the return of the defendants from the robbery is incorrect. He who prepared the brief made the same mistake that it is quite possible the jury did; he failed to distinguish between Alvarez' testimony, in which he denied any knowledge about the robbery, and Officer Houghton's testimony as to Alvarez' statement to him, in jail, a statement which was expressly limited, as evidence, to Alvarez alone. In the premises it was error to receive these several weapons, and

the testimony concerning them, into evidence. (*People* v. *Sansome* (1890), 84 Cal. 449, 452-454 [24 P. 143, 144] ; *People* v. *Gonzales* (1924), 66 Cal.App.646, 647, 648 [226 P. 946, 947] ; *People* v. *Milburn* (1928), 89 Cal.App. 526, 528 [265 P. 285, 286] ; *People* v. *Quinn* (1931), 111 Cal.App. 614, 619 [295 P. 1042, 1044].)

One other matter merits mention, because it may be of moment on a retrial. There was testimony that Alvarez was brought into the presence of each codefendant, separately, and after he had repeated his statement of driving the men to the scene of the robbery, and so on, each codefendant was invited to say what he had to say in response. It was not error, as to Alvarez' codefendants, to receive this testimony. The equivocal responses made were proper subjects for the jurors to weigh although they had before them the report that each codefendant had consistently, on all other occasions, denied any knowledge of the robbery.

For the reasons given, the judgments of conviction and the order denying the defendants a new trial are reversed.

Shinn, Acting P. J., and Wood (Parker), J., concurred.