[Crim. No. 5384. In Bank. July 14, 1953.]

THE PEOPLE, Respondent, v. ROBERT CARLTON LOGAN, Appellant.

William B. Esterman and Richard L. Rykoff for Appellant.

Edmund G. Brown, Attorney General, and Dan Kaufmann, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant appeals from a judgment pursuant to the verdict of a jury which found him guilty of (count one) assault with a deadly weapon and (count two) robbery of the first degree, and from an order denying his motion for new trial. We have concluded that various matters, hereinafter described, of which defendant complains did not constitute prejudicial error, but that the judgment must be reversed as to the first count because a single, indivisible act (the use of a baseball bat as a club) constituted count one assault *with a deadly weapon* and count two robbery *of the first degree* because committed by one "armed with a dangerous or deadly weapon" (Pen. Code, § 211a).

The People's evidence discloses the following events: Early on the morning of May 12, 1951, Mrs. Adalyn Hickson was walking toward her home. She had left the store where she was employed as a cashier at 12:30 a.m. As she neared her home, she testified, "I heard light footsteps right behind me, just a few footsteps, I didn't have a chance to turn around," and "I came to in the hospital." She had suffered skull fractures, concussion, and cuts and bruises on her face and head. This incident occurred between 1:30 and 2 a.m., according to Mrs. Hickson's testimony.

At 1:40 a.m. Police Officers Judd and Bunda, on routine patrol duty in a radio car, observed a Ford car with lights off being driven away from the vicinity where Mrs. Hickson was later found. The lights of the Ford came on and it was driven through a boulevard stop without a halt. The officers displayed the red light of the police car as a signal to defendant, the driver of the Ford, to stop. Instead he accelerated and drove away, made a right turn and then a second right turn, the latter into a private driveway, and crashed through a metal gate. He then got out of the car, threw an object into the next yard, and ran toward the rear of the yard in which he was. The officers had pursued defendant, first in the police car and then on foot. At Officer Judd's command defendant halted at the rear of the yard into which he had driven. Officer Judd "asked the defendant what was the matter with him and what he threw over the fence. . . . The defendant stated that he was drunk and that he had not

thrown anything over the fence.'' In the adjoining yard
Officer Judd found Mrs. Hickson's purse. Defendant then
said that ''he had found the purse in a parked vehicle.'' In
defendant's Ford was a baseball bat which, it was later
learned, had a spot of human blood on it. Defendant had
been drinking but did not appear to be intoxicated.

The officers took defendant to a police station where they
and Detective Barclay interviewed him. Defendant first re-
peated that he had found the purse in an automobile. Bar-
clay said, ''Don't lie, I know better, where did you get the
purse?'' Defendant then said that he had taken it from a
woman, that he had struck her with his fist and she had fallen
down, that she had not screamed and that he did not know
whether she got up after he struck her. Defendant further
said he did not know the name of the street where the attack
took place but that he believed he could direct the officers to
the vicinity. The officers took defendant to the address shown
in Mrs. Hickson's purse and found that she was not there.
They then drove slowly along the street where defendant said
the attack had occurred, defendant ''stated that a bush looked
familiar,'' and Officer Judd got out of the car and found Mrs.
Hickson, unconscious, lying on the lawn. She was discovered
at about 3:30 a.m. At this time defendant said, ''She isn't
dead, is she? She's dead? Why don't you shoot me?''

The police summoned an ambulance, other officers, and
photographers. While he was still at the scene of the crime
defendant said he had hit the woman with a stick, then ad-
mitted that he had hit her with the baseball bat which was
in his car and that he did not know why he had done so.

At about 4 a.m. defendant was taken back to the police
station. Under questioning by the police he made a con-
fession which was reported and transcribed by a stenographer.
At about 5:30 a.m. defendant signed each of the five pages
of the statement. Defendant was then taken to a cell where
he slept. The next morning at about 10:30 another officer
assigned to investigate the case questioned defendant and de-
fendant again confessed and described the assault.

The substance of defendant's confession is as follows: He
was on his way to pick up his wife, who had been to a party,
when he saw a woman walking along the sidewalk. He did
not observe whether she had a purse. Defendant stopped his
car, got out, and hit the back of her head with the baseball
bat. The bat was part of the athletic equipment which de-

fendant used in his work as a playground director. Defendant seized the woman's purse, fled, and was apprehended in the manner described by Officers Judd and Bunda.

At the trial defendant testified that he had not followed anyone or struck anyone with anything or taken a purse on the night of May 11 or early morning of May 12, 1951. He categorically and repeatedly denied having made any of the various oral admissions and confessions to which the officers had testified. He testified that the incriminating portions of the transcribed statement which he made in the police station had not been made by him in answer to questions but had been formulated by the interrogating officers after discussion between them in his presence, and that he signed the typed statement without having read it because "I was so dead for sleep at the time I wanted more than anything in the world just to be allowed to lie down and go to sleep and then again I was afraid if I didn't sign it I would be beaten like I was beaten before when I was a kid, by the police." (The circumstances under which the typed statement was prepared will be hereinafter described in connection with the discussion of its admissibility in evidence.)

### Photographic Evidence

Over defendant's objection the trial court admitted in evidence two photographs, taken at the scene of the crime shortly after its discovery, which show defendant, police officers, and the bleeding victim, and a photograph, taken at the police station after defendant had been returned there, which shows defendant, the baseball bat, and Mrs. Hickson's purse. Officer Judd testified that the photographs accurately show the circumstances there depicted. They do not purport to represent reenactments of the crime.

Defendant argues that the photographs serve no proper evidentiary purpose and connect him with the crime in such a striking manner that the jury may well have been unduly impressed by them. The effect of the photographs was made worse, defendant says, by the following argument of the prosecuting attorney to the jury: "The woman was in a horrible condition, as you will see from these pictures, and I have no idea what might have happened to the woman, he might have been tried on a much more serious charge if nobody had found her until morning. In any event, you have this exhibit, showing the condition of this woman at the time she was found there. She is in a very, very bad

condition. As you know, all this is in evidence and the Judge will instruct you have the right to take it to the jury room and look it over carefully. This is briefly the picture of the woman just as she was found there by the officers. And then you have the other picture here of everybody at the scene, including the defendant, and the lady being taken away on the stretcher. You can look that over in the jury room. Then you have the picture of the defendant which was taken at the police station later.''

■ The above quoted argument of the prosecuting attorney does not suggest that the photographs are evidence of anything more than that which they depict and to which the officers testified. However, it is not apparent how the jury would be aided in solving the facts of the case by pictures showing defendant in the presence of the victim. As defendant says (quoting from *People v. Burns* (1952), 109 Cal.App.2d 524, 542 [241 P.2d 308]), ''photographs should not be offered or admitted for any purpose other than to help the jury.'' (See *People v. Dabb* (1948), 32 Cal.2d 491, 498 [197 P.2d 1]; *People v. Sambrano* (1939), 33 Cal.App. 2d 200, 213 [91 P.2d 221].)

■ The People argue that the photographs were admissible to show the scene of the attack, the condition of the victim, and the relevant real evidence of the victim's purse and of the bat which, according to other evidence, had been used as a weapon. (See *People v. Ah Lee* (1912), 164 Cal. 350, 352 [128 P. 1035]; *People v. Smith* (1940), 15 Cal.2d 640, 649 [104 P.2d 510].) Furthermore, the People say, the photographs were admissible to support the officers' testimony that defendant was with them at the scene of the crime and was in the police station. Obviously the foregoing matters could have been shown without the graphic connection of defendant and the victim which resulted from photographing them together. ■ However, in view of the abundance of other evidence connecting defendant with the crime, it does not appear that the erroneous use of the photographs amounted to prejudicial error requiring a reversal.

## The Prosecuting Attorney's Reference to an Asserted Prior Criminal Record of Defendant

The first reference to any prior criminal record of defendant occurred during cross-examination of Officer Brennan, a witness for the People. Brennan was assigned to this case as investigating officer and prepared a report which con-

tained information as to defendant's background. Defendant's counsel asked Brennan, "Since you have testified this morning do you remember anything else you told him or that he said to you that had not come to your mind this morning . . ." The officer replied, "Well, there is another thing, . . . after I read this [report] it refreshed my memory that I had asked him if he had ever been arrested before or if he had ever done . . . service in the State Penitentiary and . . . his answer was that he was arrested in '42 for assault and battery and did three months locally. He also stated that he was arrested once in Richmond, California, but that the outcome was that he went into the Army and the case was dismissed." Defendant's counsel proceeded to establish that in 1942 defendant had been 16 years of age, then asked, "Did you inquire of him concerning this arrest that you just told me about any further than what you have just told us?" The officer replied that he had not.

Thereafter defendant produced five character witnesses who testified to his good reputation for peace and quiet. In cross-examining one of these character witnesses, defendant's sister, the prosecuting attorney asked, "Have you ever heard of him being arrested?" The witness testified that she had heard of defendant's being arrested in Richmond. She further testified, over objection of defendant's counsel, that she had not heard what the Richmond charge was, that she had heard that it was dismissed, and that she had not heard of any arrest of defendant in 1942. Another character witness, defendant's brother, was asked on cross-examination, "Have you ever heard that he was convicted of the offense of assault and battery?" After vigorous and repeated objections by defendant's counsel the brother testified, "I heard by way of mouth, and that is all." Further cross-examination and redirect examination of the brother brought out the fact that he meant that he had heard that in 1942 the defendant "had a little trouble down in Los Angeles," and had been accused but not convicted.

Defendant's counsel then called the prosecuting attorney as a witness and asked him whether he had checked official records and found any record of any previous arrest or conviction of defendant. The attorney replied, "I have no record except what the officer told me and what he told me the defendant has told him." Defendant urges that the prosecuting attorney was guilty of prejudicial misconduct in asking the character witnesses whether they had heard of certain arrests

and convictions without having first investigated and determined whether such arrests and convictions had actually occurred. Defendant subsequently testified that he had not been convicted of anything and had never spent any time in jail prior to his arrest on the present charge, and that he had not made the statement concerning serving time which the officer attributed to him.

No convincing reason for attributing bad faith to the prosecuting attorney appears; in the absence of knowledge or notice to the contrary he was entitled to accept the apparently credible admissions of a prior conviction to which the police officer had testified. And the manner in which he sought to impeach the character witnesses' testimony to defendant's reputation was proper. "In the absence of a showing of bad faith it is always within the scope of legitimate cross-examination to ask a character witness whether he has heard the person whose reputation is under investigation accused of conduct inconsistent with the character attributed to him by the witness." (*People* v. *McKenna* (1938), 11 Cal.2d 327, 335-336 [79 P.2d 1065].) "One way to test the accuracy and weight of the statement of the witness as to the existence of the good reputation of the accused is for the prosecution, in good faith, to ask the witness whether he has heard of certain rumors, occurrences or charges as to specific acts of misconduct of the accused relating in general to the traits involved in the charge." (*People* v. *Gin Shue* (1943), 58 Cal.App.2d 625, 634 [137 P.2d 742].)

Defendant urges that the trial judge should have given the following instruction requested by him: "there is no evidence whatever in this record that the Defendant has ever been convicted of any crime . . ." The instruction was properly refused; there was some evidence to that effect (the testimony of the police officer, as to which there was no motion to strike, that defendant had told him he had served three months in jail).

### Sustaining of Objections to Defendant's Testimony that His Automobile was Noisy

Defendant was asked by his counsel whether his car was noisy in its operation. Objections to such questions on the ground that they called for immaterial answers were sustained. In the course of an offer of proof made outside the hearing of the jury defendant's counsel stated that he wished to introduce this evidence to show that the crime

could not have occurred in the manner shown by portions of the People's evidence; i.e., the testimony of the victim that immediately before she was struck she heard only "light footsteps," and the testimony of an officer that defendant told him that "he turned the car around and got up close to her, took a baseball bat out of the back seat and snuck up behind her and struck her."

As the People point out, defendant was permitted to give other testimony upon which he could base an argument that he could not have been the assailant because the victim would have heard his automobile; i.e., he testified that the car "rattled very loud," and that one "definitely" could hear the engine. In the circumstances the refusal to admit defendant's cumulative testimony as to whether the car was "noisy" could not have prejudiced him.

### Admissibility of Alleged Transcribed Confession

Defendant testified that on the night before the crime he had only four hours' sleep because he had studied for a college examination; that after taking the examination he spent the day in vigorous physical activity in his employment as playground director; that he had no dinner, only coffee, waxed the floors of his home, then went to a party where he had six or seven drinks of bourbon, and was driving to pick up his wife, who had attended another party, when he was arrested. As previously indicated, defendant further testified that as a result of his previous physical and mental exertion and lack of sleep he was exhausted at the time he was questioned by the police.

Defendant also testified that after he was apprehended he was handcuffed so tightly that the circulation in his hands was cut off and his wrists were bruised and bleeding. His wife testified that she saw defendant on the afternoon following his arrest and saw blood "oozing from his wrists." Officer Judd testified that after he handcuffed defendant, defendant complained and the officer found that one of the handcuffs "was a little tight . . . so I loosened the tight handcuff." The various officers who observed and questioned defendant testified that there was no visible injury from the handcuffs.

Photographs of defendant's hands and wrists assertedly taken three days after his arrest (the day following his release on bail; defendant's Exhibits G and H), tend to support defendant's testimony that both handcuffs were drawn so tight as to cut through the skin and into his flesh. (It

must be remembered that the matter now in controversy before us does not concern possibly indicated proceedings against the apparently offending officer either in respect to his treatment of the prisoner or the possible inaccuracy of his testimony in regard to such treatment; it concerns only questions as to the admissibility of defendant's confession and the trial court's rulings in relation to the proceedings before it.)

Other testimony of defendant, denied by the police officers, concerning the circumstances preceding the preparation of the written statement was as follows: Defendant protested against the taking of pictures at the scene of the crime. After the taking of the pictures Officer Bunda "hit me with his elbow . . . right above the heart . . . several times." The booking officer at the police station spoke to defendant profanely and obscenely, and while defendant was waiting to be fingerprinted the jailer refused his requests for water and cigarettes. Officer Barclay, who directed the preparation of the written statement, told defendant, "if you cooperate with us in every way I will see that you get the softest bed in the house."

The officers testified that defendant made the statement which was transcribed voluntarily and that he read it before signing it. It was not until about 10:30 on the morning of May 12th that one of the officers told defendant that he could call an attorney; there is no evidence that defendant had previously requested and been refused permission to make such a call.

The above summarized evidence does not support defendant's claim that, as a matter of law, the confession was involuntary and, therefore, inadmissible. The evidence presents a substantial conflict. It supports the trial judge's determination of the initial question whether the confession was admissible, and the jury were correctly instructed that it was for them to determine whether the confession was made and whether it was voluntary, and that they must disregard it if they found it was involuntary.

Defendant, as previously indicated, testified that his statement was not made in direct question and answer form, as is the statement introduced in evidence, but that the questions and answers were prepared by the interrogating officers and the stenographer in the course of discussion which was not reported and transcribed. He relies upon *People* v.

*Williams* (1942), 20 Cal.2d 273, 285 [125 P.2d 9], where a judgment of conviction was reversed because the People, among other things, "failed to prove . . . that the type-written statement purporting to be his [defendant's] confession was the record of his conversation." The situation here is not like that in the Williams case. Officer Barclay, who assertedly asked the transcribed questions, testified that the transcript was correct. It was for the jury to determine whether his testimony or that of defendant as to the correctness and completeness of the statement was true.

### Double Punishment Based Upon One Indivisible Transaction

It is apparent from the descriptions of the criminal transaction in the testimony of the victim and the confessions and admissions of the defendant that the striking of the victim with the baseball bat and the taking of her purse constituted a single, indivisible transaction. The one act of inflicting force with the bat cannot both be punished as assault with a deadly weapon and availed of by the People as the force necessary to constitute the crime of robbery, for "co-operative acts constituting but one offense when committed by the same person at the same time, when combined, charge but one crime and but one punishment can be inflicted." (*People* v. *Clemett* (1929), 208 Cal. 142, 144 [280 P. 681]; *People* v. *Greer* (1947), 30 Cal.2d 589, 604 [184 P.2d 512]; *People* v. *Knowles* (1950), 35 Cal.2d 175, 187 [217 P.2d 1].)

The People rely upon *People* v. *Thomas* (1943), 59 Cal. App.2d 585 [139 P.2d 359], which discusses only the problem of included offenses, not the problem of double punishment. They also rely upon *People* v. *Coltrin* (1936), 5 Cal.2d 649, 660 [55 P.2d 1161], which expressly recognizes that "If the act involved in one charge is necessarily involved in the other and is merely incidental to that charge but one offense is committed and it cannot be carved into two offenses in order to inflict a double punishment," and upon *People* v. *Hoyt* (1942), 20 Cal.2d 306, 317 [125 P.2d 29]. However, as is well stated by defendant's counsel, "no mere combination of words can result in an inflexible yardstick by which *all* cases may be measured; in each case the particular facts have had to be related to the legislative intent." (Italics defendant's.)

Since the Legislature prescribed a greater punishment for the crime of robbery by a person armed with a dangerous or deadly weapon (imprisonment in the state prison

for not less than five years; Pen. Code, §§ 211a, 213) than for the crime of assault with a deadly weapon (imprisonment in the state prison for not more than 10 years or in the county jail for not more than one year, or fine; Pen. Code, § 245), the robbery must be considered as the more serious offense and the conviction thereof must be affirmed; the conviction for the less serious offense must be reversed. (*People* v. *Knowles* (1950), *supra*, p. 189 of 35 Cal.2d.)

For the reasons above stated the order denying the motion for a new trial is affirmed; the judgment of conviction of assault with a deadly weapon is reversed; and the judgment of conviction of robbery is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Spence, J., concurred.