[Crim. No. 6716.   In Bank.   June 8, 1961.]

THE PEOPLE, Respondent, v. JAMES KENDRICK,
Appellant.

Edward P. Foley, Public Defender, for Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

DOOLING, J.—A jury found defendant guilty of burglary in the second degree (count one), robbery in the first degree (count two), and murder in the first degree (count three); and fixed the penalty on the murder count at death. This is an appeal (pursuant to Pen. Code, § 1239, subd. (b)) from the ensuing judgment and from an order denying defendant's motion for a new trial.

At the trial the evidence included admissions and confessions which defendant claims were involuntarily made and induced by promises and psychological coercion. Defendant's further contentions concern: (1) rulings on the admission of evidence; (2) limitation of the cross-examination of certain prosecution witnesses; (3) giving of two instructions; (4) denial of defendant's request to be taken on a location trip; (5) alleged misconduct of the prosecuting attorney; and (6) alleged misconduct of the trial court.

The convictions were based on evidence of the following facts:

### COUNT ONE

On February 16, 1960, the Budget King Market in Grand Terrace, San Bernardino, was closed by the manager about 11 p. m. He was the last person to leave. Before leaving he

put the cash in the office safe. The vault contained an upper partition which had a combination lock and a lower partition which required two keys to open. About 7 o'clock the next morning when the manager returned, the front door of the market was still locked and so was the safe. Upon opening the safe, the manager discovered that the cash, some $600, which had been in the upper portion of the vault, was missing. There was no evidence of a break-in—no door or windows broken—and apparently entry had been made through use of a key.

Sherilyn Young had worked as a checker in the market in 1958-1959, during which time she was married to Orlyn Young, the son of the owner of the market. In December 1959, after separating from her husband, Sherilyn was in possession of his keys for a time. Without telling her husband, she had a duplicate key made to the front door of the market before returning the keys to him.

On February 3, 1960, while Sherilyn was riding with defendant and Arnold Ray Reese in a car from the San Bernardino area en route to Las Vegas, Sherilyn gave the duplicate market key to Reese. Defendant took the key from Reese. The latter was a friend of Orlyn Young, knew the combination of the market safe, and gave it to defendant. On February 17 about 1:30 a. m. defendant and Reese drove to the Budget King Market. Reese remained in the car while defendant went into the market. Some 10 minutes later defendant returned to the car and gave Reese about $250 of the $600 he had stolen. They then drove back to Lake Tahoe, where they and Sherilyn Young had been staying in the home of Betty and Boyd Frame, Reese's sister and brother-in-law.

### Count Two

On February 23, 1960, upon closing the same Budget King Market the manager prepared to leave about 9:30 p. m. Before leaving he placed the money on hand in the lower partition of the vault and locked it. As he walked to his car and started to enter it, a man apparently armed with a gun (later identified as defendant) approached and ordered him to return to the market. Following defendant's orders, the manager unlocked the front door of the market and also opened the safe, where there was some $800 in cash. Defendant then took the manager to a back room, ordered him to lie on the floor and tied his hands and feet with a small nylon white cord. Defendant removed the money from the safe. He then returned

to the room where he had left the manager and took the latter's wallet containing about $25 and a pay check. Defendant was carrying a sawed-off shotgun, which he wore under his coat in a sling to which it was tied with the same type of white nylon cord as was used to tie the manager's hands and feet. Defendant wore a blue glove on his left hand. Reese testified that defendant bought a shotgun and some 12-gauge shells at Lake Tahoe on February 17; that defendant also purchased a hacksaw that day; and that he and defendant sawed off the shotgun. Reese further testified that the next day he saw defendant with the shotgun slung over his shoulder and a white nylon cord was attached to it; and that he also saw defendant with some blue gloves.

## COUNT THREE

On February 23 about 10 p. m. upon completing the robbery, defendant left the market and drove down the Barstow Freeway toward Victorville. He was driving about 70-75 miles per hour. As he neared Victorville he was stopped by Richard Duvall, a traffic officer. Carrying a flashlight and his citation book, the officer ordered defendant to get out of his car. Defendant picked up a .32 automatic gun which he had on the seat beside him, injected shells into the gun chamber, and as he got out of his car, he turned and fired at the officer. The first shot went through the officer's heart and lodged in the back cavity; then a second shot was fired, which pierced the officer's head near his eye.

Lyle Wagner, a passing motorist, saw defendant's car "pull out fast" from the side of the road, leaving the red light of the California Highway Patrol car blinking and an object lying on the road. Wagner stopped his car, saw that the object on the road was the officer's body, and started to investigate. Joel Jamison, another motorist, then came upon the scene and joined in the investigation. They noted that the officer was in uniform, his pistol was in its holster, and the flashlight was on the ground near his right leg. They called for help on the radio in the highway patrol car, and Officer Louis McNeill, who was on duty in that area, proceeded to the scene. Meanwhile he radioed the Highway Patrol Headquarters. Lieutenant Barton Keene of the San Bernardino County Sheriff's Office, Homicide Division, received the summons about 11:15 p. m. and he, with Detective Jones, immediately drove to the scene. Duvall's body was still lying on the road, and Lieutenant Keene picked up two .32 shells some 12 feet from Duvall's head. No other shells or slugs were

found. The next day Lieutenant Keene turned over the two shells to Anthony Longhetti, criminalist for the sheriff's office. On February 24 an autopsy was performed. The doctor gave his opinion that the cause of death was a gunshot wound in the heart; he also observed both an entrance and exit bullet wound in the head; and he removed a copper clad bullet from the soft tissues of Duvall's back and gave it to Longhetti for examination.

On March 1 Longhetti, with Detective Jones, another officer, and Sherilyn Young, drove to a point about 20 miles east of Baker, California. This was the location where Sherilyn said that defendant did some target firing, four to six shots, at a yucca tree when they stopped their car on February 3 on their trip en route to Las Vegas. She said that defendant used an automatic gun which he designated a .32 caliber automatic. The officers and Longhetti found there four empty .32 shell cases, a .32 slug and a .32 live bullet. Longhetti made a microscopic examination of the slug so found, comparing it with the slug removed from Duvall's body, and gave his opinion that they were fired from the same gun. Longhetti also compared the two empty shells found near Duvall's body with the shells found near the yucca tree; and likewise designated them as all fired from the same gun.

On February 29, 1960, defendant was apprehended in a motel at Shell Beach near San Luis Obispo. He resisted arrest, firing four or five shots from his room, and the arresting officers had to use tear gas before they could subdue him. He was placed in jail about 10 p. m.

On March 2, 1960, defendant confessed to the three offenses to Deputy District Attorney Pike in the presence of Lieutenant Keene and Detective Jones. The confessions were transcribed and admitted in evidence. Also on March 2 defendant reenacted for colored sound movies the circumstances of the homicide at the place where it occurred, and this movie recording was admitted in evidence. On March 3 defendant was taken to the scene of the target-firing 20 miles east of Baker, and he admitted that he had fired his .32 automatic gun there while in the company of Ray Reese and Sherilyn Young in the course of their February 3 Las Vegas trip. Later on March 3 defendant also identified at the Victorville Substation an automobile, a Chevrolet which he had stolen from Gardena, as the car which he used and abandoned after he had committed the homicide. On March 4 Dr. Otto Gericke, Superintendent of Patton State Hospital, at the request of

the district attorney's office, questioned defendant in jail about his family background and history and the charges against him. Defendant made certain admissions as to the robbery of the market and his subsequent shooting of the highway officer in the belief that the latter had received word as to the robbery and intended to arrest defendant for that offense. Among other things, defendant stated that if he had not believed that the officer was armed, he would merely have held up the officer and then tied him with a rope which he carried in his car. Defendant contends that these "admissions and confessions" were improperly obtained and should not have been admitted in evidence.

### Voluntary Character of the Admissions and Confessions

On February 29 from 11 p. m. to 3 a. m. the next morning, March 1, defendant was interrogated in San Luis Obispo County by a deputy sheriff and other officers. The interrogation was recorded. He was then returned to jail. About 9 a. m. March 1 defendant was taken by two officers to San Bernardino. During the trip defendant wore handcuffs and leg irons. At noon they stopped for lunch, and they reached San Bernardino about 3 p. m. During the trip one of the officers questioned defendant about the charges against him. There was a crowd of some 50 persons gathered at the San Bernardino courthouse when defendant arrived, photographers took defendant's picture, and some hostile remarks were purportedly made, with defendant testifying that he heard a uniformed officer state that he would like to see a picture of defendant with a rope around his neck. Defendant was taken to the homicide office. Two officers there began questioning defendant; other officers and detectives came into the room at various times, joined in the interrogation, and the conversations were recorded until about 6:40 p. m. Further unrecorded conversation continued between defendant and various law officers; and defendant was told that Reese, Sherilyn Young, and Betty and Boyd Frame were then in jail, and defendant's mother and wife might be subject to arrest if they had concealed his presence from officers seeking to arrest him. Defendant was given his dinner at 8:30 p. m. During all these interrogations and conversations defendant made no admissions or confessions as to guilt of the offenses in question.

Shortly after 9:30 p. m. on March 1, Reese was brought into the room and questioned in defendant's presence for about 10 minutes. Reese was obviously nervous and upset,

and defendant claimed that he felt sorry for him. In the course of the interrogation of Reese, defendant interrupted to state that he would "give . . . a full statement only if . . . all four of them (Reese, Sherilyn, and the Frames)" were turned "loose." After Reese left, the officers began negotiating with defendant about his offer, with Lieutenant Keene finally stating that he would "take the matter up with some one else higher than" himself but if there was any murder charge standing against Reese or Sherilyn, he would see that it was lifted. Then about 10:20 p. m. Sherilyn Young was brought into the room and questioned for some 10 minutes, after which she left.

The questioning of defendant was again resumed about 10:45 p. m. until 1:30 the next morning, March 2. The interrogation was recorded. At the outset in response to Lieutenant Keene's query, defendant stated that the statement he was about to make was free and voluntary with the understanding that the officer would "try to get the other ones (the four persons above mentioned) released". . . would "go to higher authorities and see what . . . could [be done]". . . but there were "no promises." During the interrogation defendant agreed to make certain identifications, and the next day he did so in the company of officers with a movie reenactment being made showing the target area in the desert; the automobile defendant used on February 23, the night of the robbery and homicide; and the motel in San Bernardino where defendant spent the night after the homicide. Near the end of the interrogation of March 1, defendant was again queried about the voluntary nature of his statements, and defendant specifically replied that "no promises" were made other than that the officers had agreed to do what they could "for them other people" but "didn't say anything about no promise or anything," only they would "tell them four upstairs that [defendant] did what [he] could for them." Defendant was returned to his cell about 2:30 a. m.

Later on the morning of March 2 defendant made the identification trips with the officers as previously agreed, and each time defendant reaffirmed, in answer to questions, the voluntary nature of his statements and that no force or threats were used against him. Defendant was returned to the courthouse in the late afternoon, and about 5:20 p. m. he was taken to the district attorney's office where Deputy District Attorney Pike, in the presence of two officers and the shorthand reporter, questioned defendant about the

charges. The transcript of the questioning comprised 62 pages. Pike did not advise defendant of his constitutional rights until the questioning was about two-thirds finished (p. 41 of the transcript). However, in this regard Pike testified that he told defendant that anything defendant said could be used against him; and defendant said that he knew it, that he understood his legal rights—that he knew he could have a lawyer if he wanted one, that no one had the right to promise him a reward or immunity for any statement he was making; that all the statements and movie recordings made were voluntary, and that he had no complaints about the way the San Bernardino officers had treated him.

Defendant was not taken for arraignment until about 4 p. m. on March 3 in the San Bernardino Municipal Court. This was some 66 hours after defendant was jailed. Penal Code, section 825, provides: "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays . . ." The court was available for arraignment on March 1, 2 and earlier on March 3 (Tuesday-Thursday). The judge presiding at the arraignment advised defendant of his legal rights, including the right to have an attorney represent him at all stages of the proceedings.

As above mentioned on March 4, defendant was interviewed in jail by Dr. Gericke, the Superintendent of Patton State Hospital. Defendant claims that he answered the doctor's inquiries about the charges against him not knowing the doctor's identity and believing him to be a law enforcement agent with whom defendant should discuss the matter of securing the release of persons held in jail.

Reese was ultimately charged with only one offense, burglary. Sherilyn Young was originally charged with investigation of burglary but that charge was dismissed. Frame was held as a material witness in the case, and no charges were filed against Mrs. Frame.

Defendant took the stand relative to the issue of voluntariness of his statements and confessions. He testified that in the first interrogations of March 1, he denied commission of the crimes and when the officers asked him to take a lie detector test, he refused because he wanted first to consult a lawyer. On cross-examination, defendant admitted that he had been subjected to no force or violence, and no promises were made to him during the various questioning periods; that he had no complaint about the treatment accorded him;

that his only relationship with Reese, Sherilyn Young, and the Frames was that of "friend."

Before the movies showing defendant's reenactment of the crimes were introduced in evidence, the San Bernardino County Sheriff testified that defendant, in response to the sheriff's query, had stated that the movies were freely and voluntarily made; and defendant's objection that the statements therein made were induced by promises and psychological coercion was overruled. In so ruling, the court outside the presence of the jury stated that it did not believe defendant's testimony that any threats were made as to his mother or wife by the officers, that it believed defendant was induced to make the statements he did because of first hearing the statements of Reese and Sherilyn Young with reference to the matters charged and defendant's having a .32 caliber gun; and that defendant had been before the courts on prior occasions and well knew his constitutional rights. (The recorded conversations of March 1 [before defendant's later confessions] played outside of the presence of the jury reflected some prior convictions and defendant himself in his testimony referred to seven prior felonies he had committed. The recorded statements of Reese in defendant's presence on March 1, about 9 :30 p. m., reflected, among other things, his and defendant's participation in burglarizing the market, defendant's possession of both a sawed-off shotgun and a .32 automatic pistol, and defendant's firing of the latter gun several times in target practice on the occasion of their trip to Las Vegas with Sherilyn Young. The recorded statements of Sherilyn Young in defendant's presence later in the evening of March 1 [10 :20 p. m.] reflected, among other things, defendant's possession of the .32 automatic pistol, his target practicing with it in the desert, and her releasing to him a key to the market that was burglarized.)

█ The requirement that a confession be voluntary is one of public policy, and it is a fundamental right of the defendant, denial of which is a violation of due process. █ Generally "the pressure that is used to induce a confession consists of either a threat of harm of some sort or of a promise of some benefit to the prisoner." (*People* v. *Abbott*, 156 Cal.App.2d 601, 604 [319 P.2d 664].) █ In appraising the totality of the circumstances in which a prisoner's statements were made it has been said: "[A] confession is not rendered inadmissible by a failure to advise a suspect of his right to remain silent, of his right to counsel

and that his statements may be used against him (*People* v. *Hoyt,* 20 Cal.2d 306, 314 [125 P.2d 29]), or by an absence of a suspect's counsel and friends (*People* v. *Aguilar,* 140 Cal. App. 87, 94 [35 P.2d 137, 142], or by a delayed detention, where the confession is not the product of that detention (*Rogers* v. *Superior Court,* 46 Cal.2d 3, 10 [291 P.2d 929]), or by a low emotional and mental stability on the part of the suspect if he is nevertheless capable of understanding the meaning and effect of his confession (*People* v. *Isby,* 30 Cal.2d 879, 897-898 [186 P.2d 405]). Such matters may be taken into consideration in determining whether a particular confession was voluntarily made." (*People* v. *Tipton,* 48 Cal.2d 389, 393-394 [309 P.2d 813] ; also *People* v. *Matlock,* 51 Cal.2d 682, 696 [336 P.2d 505, 71 A.L.R.2d 605].) ▮ As was said in *People* v. *Siemsen,* 153 Cal. 387, 394 [95 P. 863] : "The 'admissibility of such evidence so largely depends upon the special circumstances connected with the confession, that it is difficult, if not impossible, to formulate a rule that will comprehend all cases. As the question is necessarily addressed, in the first instance, to the judge, and since his discretion must be controlled by all the attendant circumstances, the courts have wisely forborne to mark with absolute precision the limits of admission and exclusion.' "

▮ As urged by defendant, a confession has been held involuntary and inadmissible where it was obtained as a result of "physical abuse" or "psychological torture" or "a combination of the two" (*People* v. *Stroble,* 36 Cal.2d 615, 623 [226 P.2d 330]), or under such inducements as a promise to do for an accused all that could be done (*People* v. *Gonzales,* 136 Cal. 666, 668 [69 P. 487]) or to protect the accused's family from retaliation (*People* v. *Orloff,* 65 Cal.App.2d 614, 619 [151 P.2d 288]) or a statement that if the accused confessed the punishment would be lighter (*People* v. *Johnson,* 41 Cal. 452, 454) or that it would be better for him to confess (*People* v. *Barric,* 49 Cal. 342, 345) or by threats to hold the accused's mother (*People* v. *Mellus,* 134 Cal.App. 219, 225 [25 P.2d 237]).

▮ Here the various officers and detectives involved as well as the deputy district attorney testified repeatedly at the trial that all of defendant's statements, admissions, confessions and actions in reenacting pertinent happenings relating to the crimes were free and voluntary, and made without any previous inducement or by reason of any intimidation or threat. The court reporter who transcribed the inter-

view between the deputy district attorney and defendant on March 2, when defendant made a full confession of the crimes charged, testified that he observed nothing physically wrong with defendant, no force or violence was used on defendant in his presence, and all of defendant's statements appeared to be freely and voluntarily given. Likewise Dr. Gericke, who at the district attorney's request interviewed defendant in jail on March 4, testified that he offered defendant no reward, immunity or leniency for his statements, nor used any force or violence or threats against defendant. Defendant indicated his awareness of his rights, and he had been previously before the courts. No threats of harm were made to defendant nor promises other than to carry the matter of possible release of defendant's friends to higher authorities. As to the reference to defendant's mother and wife when a detective was interrogating defendant about his alleged offenses, the detective testified that he merely commented that anyone who had transported defendant would be subject to a charge of harboring, which would include defendant's mother and wife if it appeared that they had concealed his presence from officers searching for him. The detective expressly denied that anything was said about their being arrested for that charge. While defendant testified to a contrary version of his talk with the detective, claiming that the detective threatened arrest of defendant's mother and wife, such conflicting evidence as to voluntariness of a confession will not be reweighed by the reviewing court. (*People* v. *Baldwin,* 42 Cal.2d 858, 867 [270 P.2d 1028].)

None of the cases cited by defendant's counsel supports the conclusion that the confessions and admissions made by the defendant under the circumstances shown in this case should be held as a matter of law to have been coerced or involuntary. We take up separately the more important facts relied upon by defendant: The fact that defendant was not taken before a magistrate within the time required by the statute has been held by this court (*People* v. *Bashor,* 48 Cal.2d 763, 765 [312 P.2d 255]; *Rogers* v. *Superior Court,* 46 Cal.2d 3, 10 [291 P.2d 929]) and by the Supreme Court of the United States (*Crooker* v. *California,* 357 U.S. 433, 437 [78 S.Ct. 1287, 2 L.Ed.2d 1448]) not to render a confession involuntary as a matter of law. It is only one of the relevant circumstances to be considered in determining the question of voluntariness. (*Fikes* v. *Alabama,* 352 U.S. 191, 194 [77 S.Ct. 281, 1 L.Ed.2d 246].)

The failure to allow defendant to consult counsel during or prior to his interrogation has also been held not to render a confession involuntary as a matter of law. (*People* v. *Crooker*, 47 Cal.2d 348, 353 [303 P.2d 753] ; affd. in *Crooker* v. *California, supra,* 357 U.S. 433 [78 S.Ct. 1287, 2 L.Ed.2d 1448].)

We must therefore look to the other facts surrounding the defendant's interrogation which led to his confessions to determine whether they, giving proper weight to the two facts previously discussed, were such as to compel the conclusion that the confessions were involuntary. ▆▆▆ The two most important factors herein are the remark that the defendant's mother and wife might be subject to prosecution if it appeared that they had concealed defendant's presence from officers searching for him, and the promise to take up with higher authorities the question of the release from prosecution of the other four persons, friends of defendant. The remark about the possible criminal liability of defendant's wife and mother falls far short of a threat to arrest them unless the defendant confessed, and does not fairly fall within the rule of *People* v. *Mellus, supra,* 134 Cal.App. 219, 225.

Nor does the promise to take up with higher authorities the question of the release from prosecution of defendant's associates compel a finding that the confessions were involuntary. These others were not related by blood or marriage to defendant but were only "friends," and the fact that a defendant believes or hopes that his confession may result in the exoneration of others does not render a confession involuntary as a matter of law. (*People* v. *Abbott, supra,* 156 Cal.App.2d 601, 605.) The other facts adverted to by defendant are none of them of a character to render his confessions involuntary as a matter of law.

▆▆▆ The conclusion of the trial court with respect to the voluntary character of a confession will not be disturbed on appeal in the absence of a clear abuse of discretion. (*People* v. *Mehaffey,* 32 Cal.2d 535, 548 [197 P.2d 12] ; *People* v. *Abbott, supra,* 156 Cal.App.2d 601, 606.) ▆▆▆ Certainly here it cannot be said from all the circumstances that the absence of counsel, the mere statement of one of the interrogating officers that he would take up with "higher authorities" the matter of dropping possible charges against defendant's friends and associates, nor the added considerations of delay in defendant's arraignment and some extended questioning, nor the statement that defendant's wife and mother might be

subject to arrest, either singly or taken together, requires rejection as a matter of law of the testimony of the officers and other persons involved in defendant's interrogation that his statements and confessions were freely made, and defendant's own repeated statements during his interrogation by the officers to the same effect. (*Cf. People* v. *Matlock, supra,* 51 Cal.2d 682, 697-698.) Rather it would appear that the trial court, in determining the voluntariness of defendant's admissions and confessions, could reasonably conclude, as it did, that defendant made them following the questioning of Reese and Sherilyn Young in his presence and their various incriminating statements against defendant relative to the crimes charged, indicating to defendant that "the jig was up."

We are satisfied that there was substantial evidence supporting the trial court's initial determination that defendant's admissions and confessions were voluntary, and the jury was properly instructed to disregard them if it found that they were involuntary. (See *People* v. *Logan,* 41 Cal.2d 279, 289 [260 P.2d 20]; 2 Witkin, Summary of Cal. Law (6th ed. 1946) Evidence, § 97, p. 1793; 19 Cal.Jur.2d, Evidence § 428, pp. 176-179.)

### Admission of Evidence

Defendant cites these instances of alleged error:

(1) The court, over objection, admitted in evidence testimony as to the police experience of Lieutenant Keene, Inspector of the San Bernardino Sheriff Office's Homicide Division, and Sheriff Bland of San Bernardino County. While they were not being qualified as experts, a foundation was being laid for evaluation of their observations concerning defendant and the scene of the homicide; and the test for admissibility is whether the proffered evidence tends "logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense." (*People* v. *Sykes,* 44 Cal.2d 166, 170 [280 P.2d 769].)

(2) The court refused to strike the testimony of the criminalist Longhetti relative to certain opinions as to powder burns on the slain officer's hat found at the scene of the homicide and the likely distance from the victim that the gun was discharged. His testimony was based on past experiments in firearm identification, and particularly with .32 caliber guns and their firing pattern. Defendant emphasizes that Longhetti never fired the gun used in the homicide

because it was never recovered and therefore without knowing the particular type of .32 automatic that was used, he could not testify to a test pattern within narrow limits. But because of this factor, Longhetti made his estimation in broad terms to include "extreme variations" as to "minimum and maximum distance." ▉ "The qualifications of an expert witness are for the trial court [citation] and any question as to the degree of his knowledge goes to the weight of his testimony rather than as [sic] to its admissibility." (*People* v. *Penny,* 44 Cal.2d 861, 866 [285 P.2d 926].)

▉ (3) The court struck certain testimony of defendant relative to a conversation with Deputy District Attorney Pike in the county jail as to the possible release of defendant's four friends who had been connected with defendant's account of pertinent happenings. Defendant claims that this testimony was relevant to the "intent" of the law enforcement officers to "carry out their bargain with" defendant. However, the issue then being determined was the voluntariness of defendant's statements to Dr. Gericke and admittedly, the particular conversation had occurred after defendant talked to the doctor. Accordingly, the court struck this latter conversation as not having any bearing on defendant's previous talk with the doctor. In such circumstances of relative immateriality, no injury "will be presumed from the adverse ruling." (*People* v. *Monson,* 102 Cal.App.2d 308, 313 [227 P.2d 521].)

▉ (4) The court admitted, over objection, testimony of a statement that Lieutenant Keene said defendant made relative to the shooting episode that occurred at the time of defendant's arrest. Defendant allegedly fired from his room four or five shots from a 12-gauge shotgun, and the police had to use tear gas to force defendant out. Defendant argues that this testimony was highly prejudicial and irrelevant to any of the issues. However, defendant's action in so resisting arrest reflected a consciousness of guilt for the jury's consideration. (*Cf. People* v. *Sykes, supra,* 44 Cal.2d 166, 170.)

### Limitation of Cross-Examination

▉ (1) The court sustained an objection to questioning of a deputy sheriff as to the location of the San Bernardino Municipal Court in relation to the sheriff's office. The witness had testified to taking defendant to the sheriff's office for questioning the afternoon of March 1, which was the day after defendant's arrest. While the fact that the municipal court was "open for business" and "located in the same building"

as the sheriff's office where defendant was questioned had a bearing on the significance of the delay in defendant's arraignment (*cf. People* v. *Stroble, supra*, 36 Cal.2d 615, 625), later in the trial the judge of the municipal court testified precisely as to its location so as to obviate the asserted error. Certainly defendant has made no showing that "exclusion" of Lieutenant Keene's testimony as to the court's location "was prejudicial." (*People* v. *Brust*, 47 Cal.2d 776, 785 [306 P.2d 480].)

(2) The court limited the cross-examination of Reese. He had testified to his involvement with defendant in the market burglary. The rejected testimony related to questions as to whether Reese may have spent some time in stopping at motels en route to the San Bernardino area prior to burglarizing the market. The court properly ruled that such matters were not "material" to the burglary issue. (*Cf. People* v. *Monson, supra*, 102 Cal.App.2d 308, 313.)

Defendant also complains that he was prevented from impeaching Reese "on a material point." The impeaching question was asked of the reporter as to whether when Reese was being held and interrogated by the officers, he had heard Reese say that defendant had dropped him off at a bus station in Pomona. It had previously been brought out in the direct examination of Reese that he had originally denied having anything to do with defendant in the market burglary, and the bus station story was advanced as an account of how Reese waited there for defendant while defendant committed the burglary. The court sustained the objection to the proposed impeaching testimony as relating to a "collateral point." Even if error, the effect of this ruling, in view of the whole case, was trivial and could not have prejudiced the defendant.

### Giving of Instructions

( 1) The court instructed that "murder which is committed in the perpetration . . . [of] robbery . . . is murder of the first degree. . . ." Defendant argues that this was improper because the "homicide was too distant in time and space" to classify it as having "occurred during the perpetration of a robbery." Here it appears that the homicide occurred some 48 minutes after the manager of the market was first accosted by defendant as he started to leave the premises. However this period of time must be considered in relation to the evidence that upon getting into his car after the robbery,

defendant placed his .32 automatic gun on the seat beside him, then sped away at 70 to 75 miles per hour, and when stopped by Officer Duvall, defendant put a shell into his gun and believing that the officer was intending to arrest him for the robbery, defendant shot Duvall. Accordingly, the homicide could properly be viewed as committed by defendant in an endeavor to effect an escape.

"Robbery, unlike burglary is not confined to a fixed *locus,* but is frequently spread over considerable distance and varying periods of time. The escape . . . with the loot, by means of arms, necessarily is as important to the execution of the plan as gaining possession of the property. Without revolvers to terrify, or, if occasion requires, to kill any person who attempts to apprehend [him] at the time of or immediately upon gaining possession of said property, [the] plan would be childlike. The defense of felonious possession which is challenged immediately upon the forcible taking is a part of the plan of robbery, or as the books express it, it is *res gestae* of the crime." (*People* v. *Boss,* 210 Cal. 245, 251 [290 P. 881] ; see also *People* v. *Kristy,* 4 Cal.2d 504, 507-508 [50 P.2d 798] ; *People* v. *Dowell,* 204 Cal. 109, 117-118 [266 P. 807] ; *cf. People* v. *Beghtel,* 164 Cal.App.2d 294, 296-297 [330 P.2d 444].) The homicide, committed as it was while defendant was in hot flight with the stolen property and in the belief that the officer was about to arrest him for the robbery, falls well within this rule.

(2) The court instructed that if the jury found that defendant's confession was made without "promises, coercion or threats" and that defendant sustained no relationship to Reese, Sherilyn Young, or the Frames as to furnish "a compelling reason" for "defendant to admit a crime of which he was not guilty," his confessing of the crimes, if he did so, "in order to protect his friends" would "not make the confession inadmissible." Defendant contends that such instruction is of "doubtful validity." However, the instruction accords with *People* v. *Newman,* 127 Cal.App.2d 430, 434 [273 P.2d 917] ; see also *People* v. *Abbott, supra,* 156 Cal.App.2d 601, 605-606.

### *Denial of Defendant's Request to Be Taken on Location Trip*

The court refused to permit defendant to be taken to Fullerton to assist his counsel to locate a certain motel and beauty parlor where Reese and Sherilyn Young assertedly

were on February 15, the day prior to the burglary of the Market. Defendant contends that since the prosecution had taken him on two identification trips during investigation of the crimes (to Victorville and to Baker), there should be no objection to defendant's going on another such trip in aid of his own defense. Defendant's request to go to Fullerton in the course of the trial was refused on the basis of evidence that he was an "escape artist" and there had been a "grave security problem with regard to [his] custody." Under the circumstances, the court's ruling was not an abuse of discretion. (See *People* v. *Monson, supra,* 102 Cal.App.2d 308, 313.)

### Misconduct of the Prosecuting Attorney

(1) Defendant first charges that the prosecuting attorney sought to "arouse the passions of the jury" by introducing in evidence two photographs of the slain officer, one taken at the scene of the homicide depicting the officer's body with surrounding articles as one of the passing motorists found it upon stopping there just after he saw defendant speed away, and the other taken at the mortuary depicting the chest and face of the slain officer, as to which the doctor who performed the autopsy testified. The photographs had relevant value, and it was within the discretion of the court to determine whether "their probative value outweighs their probable prejudicial effect." (*People* v. *Love,* 53 Cal.2d 843, 852 [350 P.2d 705].)

(2) Defendant also complains concerning the admission in evidence of a color photograph showing the slain officer in uniform. Defendant contends that there was other evidence at the trial as to the uniform's color. However, the photograph was admitted because it showed a mark on the shirt that was significant in view of the autopsy surgeon's previous testimony, and also showed certain gouge marks on the pavement. Again this ruling was within the court's discretion. (*People* v. *Love, supra.*)

(3) Defendant next complains of a question by the prosecuting attorney, on cross-examination, as to whether defendant found it "difficult to sleep after the officer was killed." (On direct examination defendant had testified that he had slept relatively little after his arrest and during the days immediately following when he was interrogated by the officers.) Defendant's objection to the prosecuting attorney's question was sustained, and any likely prejudice from the

question was therefore obviated. (See *People* v. *Lyons*, 50 Cal.2d 245, 262 [324 P.2d 556].)

■ (4) Defendant further complains of a statement by the prosecuting attorney during an interchange with defense counsel that the latter was making "a play with the jury" in asking to see certain reports of statements of witnesses that the prosecuting attorney had already offered defense counsel. The court directed both counsel to "simmer down" and then ordered the prosecuting attorney to let defense counsel look at the reports. This was a relatively inconsequential argument between counsel and no adverse effect upon defendant's case could be attributable to it.

### Misconduct of the Court

■ During the *voir dire* examination of the jury, defense counsel preliminarily outlined his probable procedure during the trial and the court admonished him as "making a little speech." At another time the court told the defendant's attorney to "take the dramatics out of [his] question." Again the court, after defendant's counsel had made an admittedly premature objection, stated "the interruption had quieted down." Finally, during defense counsel's argument to the jury when he referred to a murder case unrelated to the one at bar and the prosecuting attorney objected to such reference as beyond the scope of the evidence, the court stated that defense counsel was "doing some 'window dressing.' " When defense counsel objected to such classification of his remarks, the court stated: "I think we ought to stay more with the facts in this case." Such attacks upon the court's conduct concern trivial matters and are far from indicating that the court's attitude resulted in "depriving [defendant] of a fair and impartial trial." (*People* v. *Browning*, 132 Cal.App. 136, 153 [22 P.2d 784].)

Defendant was fairly tried and his guilt was clearly established.

The judgment and order appealed from are affirmed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and White, J., concurred.

Appellant's petition for a rehearing was denied July 5, 1961.